

**THE UNIVERSITY OF ILLINOIS AT CHICAGO**

April 26, 2019

Professor Paul A. Schewe

Re: Sexual Misconduct Investigation Finding

Dear Professor Schewe,

The Title IX Coordinator, through the Office for Access and Equity (OAE), has completed its investigation into the August 2018 complaint of Erin O'Callaghan (Reporting Party), current graduate student in the Department of Criminology, Law and Justice (CLJ), in which she alleges that you (Responding Party), Professor and Director of Graduate Studies in CLJ, violated UIC's Prohibition of Sex Discrimination, Sexual Harassment and Sexual Misconduct (Sexual Misconduct Policy)[1] when you allegedly engaged in sexual misconduct (defined in the Sexual Misconduct Policy to include sexual harassment and sexual assault).

### I. Allegations

Specifically, Reporting Party alleged that Responding Party sexually assaulted and sexually harassed Reporting Party, including by starting to perform oral sex on Reporting Party without her consent. Reporting Party alleged that Responding Party did the following:

1. invited a group of female students, including Reporting Party, to his apartment on November 2, 2017, after an informal happy hour at Beer Bistro in the West Loop, where Responding Party and others consumed alcoholic beverages, and Responding Party drove students to his residence in his vehicle;

2. pressured or encouraged others, including Reporting Party, to consume additional alcoholic beverages at his apartment even though Reporting Party had already consumed multiple alcoholic beverages at Beer Bistro and was intoxicated;

3. tried to get physically closer to and make physical advances toward Reporting Party while she and Responding Party were alone in his laundry room where he had gone to show Reporting Party (and encourage her to drink) homemade wine that was located in the laundry room;

4. sat close to Reporting Party after leaving the laundry room, touched her in the presence of others, including by putting his arm around her waist, putting his hand up her shirt underneath her bra, and rubbing her back;

5. entered a bedroom in his apartment where Reporting Party was in bed, rolled her over, took her pants off, and started to perform oral sex on her without asking her for her permission; and

6. sent Reporting Party an email on November 5, 2017, in which he stated, among other things, that he felt like he should have been more of an adult on the night

---

[1] https://oae.uic.edu/wp-content/uploads/sites/32/2018/04/2018_Spring_Comprehensive-Sexual-Misconduct-Policy-and-Procedure.pdf

**Office for Access and Equity**
809 S. Marshfield Ave., Room 717 (MC 602)
Chicago, IL 60612

Phone (312) 996-8670
E-mail oae@uic.edu
Web oae.uic.edu



EXHIBIT A

of November 2, that he should have shown more restraint, and that he should have talked more and assumed less.

## II. Summary of Information and Materials Considered

UIC takes complaints of sexual misconduct very seriously. A thorough and unbiased investigation was conducted during which OAE interviewed Reporting Party, Responding Party, and ten witnesses, and also accepted a written statement from an eleventh witness. Reporting Party and Responding Party both provided documents for the investigation. Both Reporting Party and Responding Party had an opportunity to review all of the evidence, including summaries of their own interviews, the witness statements and interview summaries, and the documents provided to OAE, and to provide comments and additional evidence to OAE investigators.

## III. Findings

The evidentiary standard that is used to determine violations of the Sexual Misconduct Policy is preponderance of the evidence, which means that the evidence must show that it is more likely than not that the Policy has been violated.

Based upon a preponderance of the evidence collected during the investigation, and taking into account all of the allegations and evidence obtained during the investigation, OAE finds that Responding Party's conduct, individually and in total, does not constitute a violation of the Sexual Misconduct Policy as either sexual harassment or sexual assault. OAE makes no findings with regard to whether Responding Party's conduct violated or was otherwise inconsistent with any other applicable policy or any other employee or faculty conduct standards or expectations.

## IV. Basis for Findings

1. **Allegation:**

   Responding Party invited a group of female students, including Reporting Party, to Responding Party's apartment after an informal happy hour at Beer Bistro in the West Loop, where Responding Party and others consumed alcoholic beverages, and Responding Party drove a few of them to his residence in his vehicle.

   **Determination of Fact:**

   Substantiated. Investigators, upon review of all the evidence, find that it is more likely than not that the instant allegation occurred as described. Reporting Party, Responding Party, and all witness statements corroborate the allegation.

   **Finding:**

   Not a violation. OAE finds that inviting students to Responding Party's apartment where alcohol was consumed and driving students to his residence does not constitute sexual harassment because the conduct does not constitute an unwelcome sexual advance, request for sexual favor, or other physical or verbal conduct of a sexual nature.

Page 3 of 10 –Finding Letter (O'Callaghan/Schewe)

2. **Allegation:**

   Responding Party pressured or encouraged others, including Reporting Party, to consume additional alcoholic beverages at Responding Party's apartment even though Reporting Party had already consumed multiple alcoholic beverages at Beer Bistro and was intoxicated.

   **Determination of Fact:**

   Not substantiated. As it relates to being pressured, there are inconsistencies in Reporting Party's statement. Reporting Party states that she was pressured to drink, but she also states, "I do not remember feeling pressured per say [sic] to drink more." There is a witness account of Reporting Party saying that the wine she and Responding Party were drinking belonged to them only, which is a statement inconsistent with being pressured. The evidence does not support a finding by a preponderance of the evidence that Responding Party pressured Reporting Party to drink more alcohol.

   Reporting Party asserts that she drank a sufficient amount of alcohol over a 4- to 5-hour period, from the gathering at the Beer Bistro through her presence in Responding Party's apartment, which caused her to blackout, rendering her incapacitated and unable to give consent to any sexual activity between her and Responding Party. While there is evidence that corroborates that Reporting Party consumed multiple alcoholic beverages, the evidence does not support a finding by a preponderance of the evidence that Reporting Party was incapacitated either at Beer Bistro or at Responding Party's apartment.

   **Finding:**

   Not a violation. Because OAE has determined that the allegation that Responding Party pressured or encouraged Reporting Party to drink more alcohol is not substantiated, the allegation cannot support a finding that the alleged conduct violated the Sexual Misconduct Policy.

3. **Allegation:**

   Responding Party tried to get physically closer and make physical advances toward Reporting Party while the two of them were alone in Responding Party's laundry room where he had gone to show Reporting Party (and encourage her to drink) homemade wine that was located in the laundry room.

   **Determination of Fact:**

   Not substantiated. The evidence does not support a finding that it is more likely than not that this alleged conduct occurred.

   **Finding:**

   Not a violation. Because OAE has determined that the allegation that Responding Party tried to get physically closer and make physical advances toward Reporting Party while in the laundry room is not substantiated, the allegation cannot support a finding that the alleged conduct violated the Sexual Misconduct Policy.

Page 4 of 10 –Finding Letter (O'Callaghan/Schewe)

4. **Allegation:**

   Responding Party sat close to Reporting Party after leaving the laundry room, touched her in the presence of others, including by putting his arm around her waist, putting his hand up her shirt underneath her bra, and rubbing her back.

   **Determination of Fact:**

   Substantiated, in part. The evidence corroborates that Responding Party had his hand on and rubbed Reporting Party's back. However, it does not corroborate that Responding Party's hand was under Reporting Party's shirt or bra. Reporting Party states that while she sat on the arm of the small couch in Responding Party's apartment, next to Responding Party, he put his hand underneath her shirt and rubbed her back. She states that she was unable to move because she was "frozen" and did not know what to do. Witness 10 asserts that he saw Responding Party's hand under her shirt and he shared this information with Witness 1 on or after the night in question. However, Witness 6[2] rebuts Witness 10's observation and states that she only saw Responding Party's hand on Reporting Party's back over her clothes. The other witnesses, to varying degrees, either saw Responding Party's hand on the back of the couch behind Reporting Party or on her back on top of her shirt. Responding Party denies having his hand underneath her shirt but says he may have touched her back. The other witnesses, to varying degrees, recall that Reporting Party stayed on the arm of the couch and did not move much or that she moved from the couch and back while engaging in conversation.

   Therefore, OAE finds that it is more likely than not that Responding Party put his hand on and rubbed Reporting Party's back. However, OAE also finds that the evidence does not substantiate, by a preponderance of the evidence, that Responding Party had his hand under Reporting Party's shirt or underneath her bra.

   **Finding:**

   Not a violation. OAE finds by a preponderance of the evidence that Responding Party placing his hand on Reporting Party's back does not constitute sexual harassment.

5. **Allegation:**

   Responding Party entered a bedroom in his apartment where Reporting Party was in bed, rolled her over, took her pants off, and started to perform oral sex on her without asking her for her permission.

   **Determination of Fact:**

   Not substantiated. Reporting Party stated that she does not recall how she ended up in Responding Party's bedroom. She and two witnesses (Witness 1 and

---

[2] By all witness accounts, Witness 6 was not intoxicated and had only one drink while at Beer Bistro, while Witness 10 was admittedly drunk and eventually "out of it." For this reason, OAE found Witness 6 to be more credible than Witness 10.

UIC

Witness 5) stated that Reporting Party was falling asleep, was lying on the couch, and did not leave with several of the witnesses who left the apartment and went to a store for approximately 10 minutes. When they returned from the store, Reporting Party was not in the living room, where she had been, but was apparently in Responding Party's bedroom. However, Responding Party asserts that Reporting Party walked into his bedroom after the others had left for the store[3], and two witnesses (Witness 7[4] and Witness 10) recalled seeing Reporting Party walk toward the back of the apartment, where the bedroom and bathroom were located, at about the time the others left the apartment and went to the store, thus leaving Reporting Party alone in the apartment with Responding Party without any concern for Reporting Party's welfare.

Witness 5 did not return to the apartment with the others after they went to the store, but went home. Witnesses 1, 6, 7, and 10 returned to Responding Party's apartment. Witnesses informed OAE that when they left the apartment to go to the store, no one expressed any concern about Reporting Party's safety or capacity.

Responding Party stated that after the witnesses left for the store, he went to his bedroom to lie down and that Reporting Party followed him into the bedroom, took off her jeans, and lay down on the bed on the side closest to the door while he moved to the side of the bed next to the wall. According to Reporting Party, she does not recall how she ended up in the bedroom but recalls that she blacked out and woke up to the feeling of Responding Party, having removed her jeans, initiating oral sex. Reporting Party stated that she then blacked out again and does not recall if Responding Party did anything else to her.

Responding Party denies initiating oral sex or sex of any kind with Reporting Party but states that Reporting Party started to grind her hips into him and only stopped when Responding Party touched her on her hip and thigh. According to Responding Party, Reporting Party froze and he stopped and they spent the rest of the night cuddling except for when he left the bedroom when the other witnesses returned from the store. Responding Party said that at some point he did remove his own jeans and acknowledges that he may have greeted the witnesses, after their return, in his t-shirt and boxer shorts.

Once the witnesses returned to the apartment only Witness 1 expressed concern about Reporting Party's whereabouts, but she did not attempt to go to the bedroom to talk to Reporting Party to determine her status; instead, Witness 1 left the apartment to return to her home with Witness 10. Reporting Party stated that she was aware that the others had returned to the apartment. Responding Party left the bedroom to greet the returning witnesses.

---

[3] Witness 6 recalls seeing Reporting Party seated on the arm of the couch right before the group went to the store.

[4] Witness 7's testimony is deemed unreliable because of his poor memory from that evening due to the amount of alcohol he drank. He did not recall going to the store but all other witnesses assert that he accompanied them.



Page 6 of 10 –Finding Letter (O'Callaghan/Schewe)

Although Witness 1 originally denied having contact with Reporting Party until approximately four days later, on November 6, 2017, after their evening class, Witness 10 informed OAE, and Witness 1 later confirmed, that Witness 1 had sent a text to Reporting Party at 12:53 am on November 3, 2017, and Reporting Party replied that she was "Okay." Witness 1 and Reporting Party also exchanged texts approximately 10 hours later, and Reporting Party did not indicate to Witness 1 that anything was wrong. After Witness 1 acknowledged to OAE that she and Reporting Party had exchanged texts soon after Witness 1 left Responding Party's apartment, Witness 1 stated that she dropped her cell phone and could not provide OAE with the screenshots of the texts as OAE had requested. Reporting Party was provided a copy of Witness 1's statement to investigators for comment, but she declined to do so.

The existence of the text messages undermines Reporting Party's statement that she was too intoxicated to consent and passed out (i.e., was incapacitated) and indicates that Reporting Party was aware of her surroundings and able to communicate. Reporting Party also continued to carry on the text conversation with Witness 1 on the morning of November 3, 2017, in which she stated she fell asleep.[5]

In sum, based on the preponderance of the evidence, the investigators find that it is more likely than not that Responding Party did not roll Reporting Party over, take her pants off, and start to perform oral sex on her.

**Finding:**

Not a violation. Because OAE has determined that the allegation that Responding Party started to perform oral sex on Reporting Party is not substantiated, a finding of sexual assault cannot be supported.

6. **Allegation:**

Responding Party sent Reporting Party an email on November 5, 2017, in which he stated, among other things, that he felt like he should have been more of an adult on the night of November 2, that he should have shown more restraint, and that he should have talked more and assumed less.

**Determination:**

Substantiated. It is more likely than not that the email was sent as investigators were provided copies of the email by both parties.

**Finding:**

Not a violation. OAE finds that sending the email does not constitute sexual harassment and does not constitute an admission that he engaged in sexual harassment or sexual assault. First, the email lacks sufficient detail to discern what Responding Party intended with the communication. Second, Reporting Party did not respond to the email; as a result, there are no subsequent emails

---

[5] For this reason, also, OAE finds that Reporting Party is not credible in this regard.

UIC

between the parties that potentially could have provided additional context by which to assess Responding Party's intent in order to help contour what is otherwise a vague and ambiguous communication.

Responding Party's explanation of his rationale for sending the email is therefore uncontroverted and is plausible. Responding Party states that the reason he sent Reporting Party the email was because she appeared to be upset while leaving his apartment (a fact that is not in dispute). Responding Party stated that he was concerned about Reporting Party and wanted to make sure she was okay and to let her know that he was willing to discuss the night in question if she so desired. Responding Party also shared with OAE investigators that when he states "I should have talked more and assumed less" in the email he was acknowledging that his assumption that it was acceptable for faculty members to have students spend the night was flawed. He also stated to OAE that he was also acknowledging that he should have asked Reporting Party whether she was signaling her consent to additional physical contact, i.e. stroking Reporting Party's leg, while they were "spooning" in his bed.

### *Analysis: Sexual Harassment*

UIC's Sexual Misconduct Policy defines sexual harassment as:

"unwelcome sexual advances, requests for sexual favors, and other physical or verbal conduct of a sexual nature when it meets any of the following:

   a. Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's education, living environment, employment, or participation in a University-related activity or program.

   b. Submission to or rejection of such conduct by an individual is used as the basis for decisions affecting an individual's education, living environment, employment, or participation in a University-related activity or program.

   c. Such conduct has the purpose or effect of unreasonably interfering with an individual's work or academic performance or creating an intimidating, hostile, or offensive environment for working, learning, or living on campus."

OAE finds that it is more likely than not that Responding Party had his hand on and rubbed Reporting Party's back over her clothes. Given the duration and context of the conduct, this conduct could reasonably be construed to be "other physical conduct of a sexual nature." The analysis then turns to whether the conduct meets a, b, or c of the sexual harassment definition.

OAE finds that it is more likely than not that submission to or rejection of such conduct was neither made a term or condition of Reporting Party's education, living environment, employment, or participation in a University-related activity or program, nor was it used as the basis for decisions affecting her education, living environment, employment, or participation in a University-related program or activity. For example, the evidence

Page 8 of 10 –Finding Letter (O'Callaghan/Schewe)

suggests that Reporting Party's ability to participate either academically or as a graduate assistant was not objectively diminished or adversely impacted, and remained unchanged after the November 3, 2017, alleged incident. For example, Reporting Party maintained an "A" average in her course work, and was also invited to participate in Responding Party's research grant, and did so.

Similarly, OAE also finds by a preponderance of the evidence that Responding Party having his hand on and rubbing Reporting Party's back did not unreasonably interfere with Reporting Party's work or academic performance or create an intimidating, hostile, or offensive environment for working or learning. When determining whether conduct rises to this level, we must assess whether the conduct in question is (a) offensive and whether it is also either (b) severe or (c) pervasive. In determining whether the complained of conduct was offensive, the evidence shows that Reporting Party did not object to Responding Party's touching at any point during the night or otherwise give the witnesses in attendance or Responding Party the impression that the conduct was unwelcome or offensive. For example, Witness 1 stated that she "couldn't determine whether Reporting Party was comfortable or not." Witness 6 stated that Reporting Party was conversing with Responding Party throughout the night and Reporting Party "seemed fine." Further, Witness 6 stated that Reporting Party got up from where she was sitting and then returned to the arm of the couch, where she had been sitting before next to Responding Party. Several witnesses also stated that Reporting Party appeared to be acting as she had been throughout the night and did not appear to object to the conduct. Had Reporting Party objected to or otherwise given some observable indication of discomfort with Responding Party's conduct, it is reasonable to conclude that at least one witness would have observed her discomfort,[6] but none of the witnesses reported observing this. For these reasons also, the conduct cannot be classified as severe. As to the pervasiveness of the alleged conduct, the complained of conduct occurred on one night only and did not persist beyond said night nor was the conduct widespread.[7]

Thus, OAE finds, by a preponderance of the evidence, that Responding Party placing his hand on and rubbing Reporting Party's back did not create an intimidating, hostile, or offensive environment and thus such conduct does not constitute sexual harassment.

*Analysis: Sexual Assault*

UIC's Sexual Misconduct Policy defines sexual assault as:

---

[6] The majority of the witnesses stated that they did not believe that Reporting Party's behavior had changed while in Responding Party's apartment, even while being touched on the back, and did not question whether it was safe to leave her in Responding Party's apartment while they went to the store. To the extent they observed discomfort with or objection to Responding Party's touching, it is reasonable to conclude that they would have intervened directly or indirectly.

[7] For conduct to be pervasive, it is not enough that knowledge of complained of conduct is widespread; the conduct itself must be widespread. So although the evidence does establish that knowledge of the complained of conduct is widespread—many witnesses learned of Reporting Party's allegations during the Fall semester of 2017 and Spring semester of 2018—there is no indication that the conduct itself is, in fact, widespread.

UIC

> "[A]ny form of non-consensual sexual activity. Sexual assault includes all unwanted sexual acts that range from fondling to attempted rape or rape. Rape is defined as penetration "no matter how slight" of the vagina or anus with any body part or object, or oral penetration by a sex organ of another person, without the consent of the victim. Sexual assault also includes sex with minors (e.g. statutory rape or incest), sex between a minor (i.e. age 17 or younger) and a person who is 18 years or older and holds a position of authority over the complainant, and sex with a person who is unable to understand the nature of the act or is unable to give consent."

In order to establish sexual assault pursuant to UIC's Sexual Misconduct Policy, a preponderance of the evidence must show that Reporting Party was subjected to "unwanted sexual acts that range from fondling to attempted rape or rape." Respondent alleges that Responding Party took her pants off and started to perform oral sex on her without asking her for her permission. As discussed in section IV.5, OAE has determined that the allegation that Responding Party started to perform oral sex on Reporting Party is not substantiated, and thus a finding of sexual assault cannot be supported.

Also, and while not alleged by Reporting Party, Responding Party shared with investigators that he stroked Reporting Party's leg while she was in his bed but that he immediately stopped when she froze. Responding Party also stated that prior to stroking her leg, Reporting Party positioned her hips (i.e., thrusted) so that they made contact with Responding Party's hips. Responding Party stated that he interpreted Reporting Party's positioning as a non-verbal cue that touching was a welcome behavior for which he received her non-verbal consent.[8] Reporting Party has denied Responding Party's version of events,[9] and asserts that she was incapacitated at the time and could not give consent. On the issue of capacity (see section IV.2), the evidence does not support a finding by a preponderance of the evidence that Reporting Party was incapacitated either at Beer Bistro or at Responding Party's apartment.

Therefore, since OAE has determined by a preponderance of the evidence that Reporting Party did not lack capacity, OAE reviewed Responding Party's version of events to determine whether his admitted conduct establishes by a preponderance of the evidence that he violated the Sexual Misconduct Policy by stroking Reporting Party's leg without her consent. The positioning of Reporting Party's hips against Responding Party's and the alleged thrusting could reasonably be interpreted by the Responding Party as non-verbal consent on the part of Reporting Party to touch or stroke her leg. Likewise, Reporting Party's reaction (i.e., she froze) to Responding Party stroking her leg could reasonably be interpreted as a non-verbal withdrawal of consent. According to Responding Party, in response to Reporting Party freezing, he stopped stroking her leg. For these reasons, if

---

[8] For purposes of the Policy, "consent" means, in part, "clear and unambiguous agreement by a competent person that is freely given and expressed in mutually understandable words or actions, to engage in a particular sexual activity with a specific person or persons." See https://sexualmisconduct.uic.edu/policy/policy-definitions/consent/

[9] Reporting Party has also stated that her recollection of that night is limited to what she shared in her complaint, which does not include Responding Party's stroking of her leg.



Page 10 of 10 –Finding Letter (O'Callaghan/Schewe)

Responding Party's self-reported conduct is true, it would not constitute sexual assault or sexual harassment.

*Conclusion*

In light of the above, based upon a preponderance of the evidence collected during the investigation, and taking into account all of the allegations and information obtained during the investigation, OAE finds that Responding Party's conduct, individually and in total, does not constitute a violation of the Sexual Misconduct Policy as either sexual harassment or sexual assault. OAE makes no findings with regard to whether Responding Party's conduct as described above violated or was otherwise inconsistent with any other applicable policy or any other employee or faculty conduct standards or expectations.

### V.     Next Steps

Since Responding Party is an employee, the Sexual Misconduct Policy does not provide either party with the option to appeal OAE's findings.

As a reminder, UIC prohibits retaliation against any person who reports sexual misconduct and/or who participates in a Sexual Misconduct investigation or resultant disciplinary process. Any report of retaliation—including by third parties—will be taken seriously and reviewed as a separate violation of the Policy.

Please note that administrative leave is a departmental/college matter. This letter does not alter the status of your administrative leave.

Sincerely,

Michael Diaz
Title IX Coordinator

c:   Astrida Tantillo
     Beth Richie
     Caryn Bills
     Amy Truelove