LAW OFFICE OF MICHAEL L. FRADIN
Michael L. Fradin, Esq.
8401 Crawford Ave. Ste. 104
Skokie, IL 60076
Telephone: 847-986-5889
Facsimile: 847-673-1228
Email: mike@fradinlaw.com


Attorney for Plaintiffs


IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ERIN O'CALLAGHAN,<br>VERONICA SHEPP,<br>KATHERINE LORENZ,<br>ANNE KIRKNER,<br>SARAH MALONE, and<br>MARLEE FRY | Case No. 19-CV-06271<br><br>**FIRST AMENDED COMPLAINT**<br><u>DEMAND FOR JURY TRIAL</u> |
|          Plaintiffs, | |
|   *v.* | Judge John J. Tharp |
| THE BOARD OF TRUSTEES OF THE<br>UNIVERSITY OF ILLINOIS,<br>UNIVERSITY OF ILLINOIS at<br>CHICAGO<br>PAUL SCHEWE,<br>MICHAEL DIAZ,<br>AMY TRUELOVE,<br>JOHN/JANE DOES 1-100, | |
|          Defendants. | |

Now Come Plaintiffs, Erin O'Callaghan ("O'Callaghan"), Veronica Shepp ("Shepp"),

Katherine Lorenz ("Lorenz"), Anne Kirkner ("Kirkner"), Sarah Malone ("Malone"), and Marlee

Fry ("Fry") (collectively "Plaintiffs"), by and through their attorney, Michael L. Fradin, Attorney

at Law, and bring their First Amended Complaint against The Board of Trustees of the

University of Illinois, ("UIC"), The University of Illinois at Chicago ("UIC") for violations of

Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 ("Title IX"). Plaintiffs also

bring this action under 42 U.S.C. § 1983 ("1983") against Paul Schewe ("Schewe**)** in his individual capacity for, among other things, violations of Plaintiffs' right to equal protection, as applicable to Plaintiffs, based on the grounds of sex, while acting in his individual capacity under color of law. Plaintiff O'Callaghan also brings Battery, Negligence, and Illinois Gender Violence Act claims against Defendant Schewe.  Plaintiffs bring this action against Title IX investigators, Michael Diaz ("Diaz") and Amy A. Truelove ("Truelove"), in their individual and official capacities.  Both Defendant Board of Trustees and the University are referred to herein as "UIC."

The severe, pervasive and objectively offensive discrimination, sexual harassment, and physical sexual violations to which Plaintiffs were subjected, coupled with Defendants' deliberate indifference, clearly unreasonable response to sexual misconduct, and mishandled internal investigation into Plaintiffs' reports, caused Plaintiffs to lose educational benefits and opportunities and to suffer other damages. Defendants' actions and deliberate indifference have caused lifelong injuries and damages that Plaintiffs suffered and continue to suffer. Defendant UIC was deliberately indifferent to Defendant Schewe's history of misconduct, fostering a safe space for sexual misconduct and empowering Defendant Schewe to abuse his authority with confidence. If this Court does not grant appropriate relief, Defendants will not stop causing, and allowing, severe and permanent harm to its female graduate students, especially (and ironically) within the Department of Criminology, Law, and Justice from a Professor who conducts research on violence women/sexual assault. Plaintiffs bring their First Amended Complaint in their true names and allege as follows:

## PARTIES

1.     Plaintiff Erin O'Callaghan is a female and a resident of the state of Illinois. At all times material hereto, Plaintiff O'Callaghan was a graduate student at University of Illinois at Chicago. Plaintiff O'Callaghan is currently enrolled in the graduate program at University of Illinois at Chicago in the Criminology, Law, and Justice Department.

2.     Plaintiff Veronica Shepp is a female and a resident of the state of Illinois. At all times material hereto, Plaintiff Shepp was a graduate student at University of Illinois at Chicago. Plaintiff Shepp is currently enrolled in the graduate program at University of Illinois at Chicago in the Criminology, Law, and Justice Department.

3.      Plaintiff Katherine Lorenz is a female and a resident of the state of California At all material times hereto, Plaintiff Lorenz was a graduate student at University of Illinois at Chicago. Plaintiff Lorenz graduated with her PhD in December of 2017 from UIC's graduate program in Criminology, Law, and Justice.

4.      Plaintiff Anne Kirkner is a female and a resident of the state of New York. At all times material hereto, Plaintiff Kirkner was a graduate student at University of Illinois at Chicago. Plaintiff Kirkner graduated with her PhD in May of 2019 from UIC's graduate program in Criminology, Law, and Justice.

5.      Plaintiff Sarah Malone is a female and a resident of the state of Illinois. At all times material hereto, Plaintiff Malone was a graduate student at University of Illinois at Chicago. Plaintiff Malone is currently enrolled in the graduate program at University of Illinois at Chicago in the Criminology, Law, and Justice Department.

6.      Plaintiff Marlee Fry is a female and a resident of the state of California. At all times material hereto, Plaintiff Fry was a graduate student at University of Illinois at Chicago until August, 2018.

7.      Defendant UIC is a public educational institution located in Chicago, Illinois. Defendant UIC receives federal funding and financial assistance within the meaning of 20 U.S.C. § 1681(a) and is otherwise subject to Title IX.

8.      Defendant Paul Schewe is a male and resident of Chicago, Illinois. At all times material hereto, Defendant Schewe was a professor at UIC. At the time of the filing of this First Amended Complaint, Defendant Schewe remains a professor at UIC. At all relevant times, Defendant Schewe was an employee of a publicly-funded educational institution and was acting individually, exploiting his governmental authority and power, violating and depriving Plaintiffs of their constitutional rights.

9.      Defendant Michael Diaz was and is employed by UIC as Title IX Coordinator in UIC's Office for Access and Equity. At all relevant times, Diaz was an employee of a publicly-funded educational institution and as such was required to conduct a professional, ethical, and thorough investigation of the allegations made against Defendant Schewe by Plaintiffs.

10.     Defendant Amy A. Truelove was employed by UIC as Deputy Title IX Coordinator in UIC's Office for Access and Equity. At all relevant times, Truelove was an

employee of a publicly-funded educational institution and as such was required to conduct a professional, ethical, and thorough investigation of the allegations made against Defendant Schewe by Plaintiffs. Defendant Truelove resigned from her position as Deputy Title IX Coordinator at UIC in May 2019.

<u>**JURISDICTION AND VENUE**</u>

11.     This case arises under the laws of the United States, specifically United States, specifically Title IX of the Education Amendments of 1972 (Title IX), 20 U.S.C. §§ 1681 *et. seq.* and 42 U.S.C. § 1983. This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1331, 1332, and 1343.

12.     This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391. The defendants are residents of the State in which this district is located and a substantial part of the events or omissions giving rise to the claim occurred in this district.

<u>**GENERAL ALLEGATIONS**</u>

13.     The facts and allegations presented in this Complaint comprise the experiences of all six Plaintiffs. All of the Plaintiffs were on the receiving end of harassment, inappropriate sexual conduct, and in the case of Plaintiff O'Callaghan, sexual assault, at different times and in different locations. All of them suffered through the hostile environment that was created in Defendant UIC's Criminology, Law, and Justice Department by the presence of Defendant Schewe.

14.     Over time, as the Plaintiffs shared their negative experiences in dealing with Defendant Schewe to one another in an attempt to process what had happened to them and what they experienced, a pattern emerged; a pattern of Defendant Schewe using his power and professional position to engage in sexually inappropriate and predatory behavior that put all women in Defendant UIC's Criminology, Law, and Justice Department at risk.

15.     Coming forward with these allegations and reporting Defendant Schewe's behavior to UIC authorities was a difficult process for the Plaintiffs. They all relied on Defendant Schewe for funding and access to professional opportunities. As they graduate and enter the job market, they expected to be reliant on him for networking and letters of recommendation. Graduate students are not well paid and they rely heavily on their professors, like Defendant Schewe, for additional paid research opportunities. The financial insecurity and power disparity

between graduate students and professors allow professors like Defendant Schewe to engage in inappropriate sexual behavior directed at vulnerable graduate students with minimal fear of consequence. While Defendant Schewe likely feels that his career and professional standing are now at risk because of his own actions, Plaintiffs are also putting their future careers and professional standings at risk by coming forward about the abuse they have received at the hands of Defendant Schewe.

16.     All Plaintiffs are uncomfortable in the presence of Defendant Schewe due to his inappropriate sexual misconduct. All of the Plaintiffs also feel that they have been constantly pressured to interact and socialize with Defendant Schewe in unsafe environments (such as his apartment and his boat) where alcohol and/or drugs are present.  If they did not participated, they would suffer negative consequences in their academic careers, over which Defendant Schewe holds significant power.

### Plaintiff Anne Kirkner and Katherine Lorenz's August 10, 2016 Visit to Defendant Schewe's Boat

17.     On August 10, 2016 Plaintiffs Anne Kirkner and Katherine Lorenz accepted an invitation to Defendant Schewe's boat.

18.     During the summer of 2016 Defendant Schewe would invite her and other women on the research team out to his boat. He would also send invitations for Plaintiff Lorenz and other students to come socialize on the boat via email.

19.     Plaintiff Kirkner had also been on the receiving end of these constant invitations and had similarly turned them down. Both Plaintiffs Kirkner and Lorenz felt uncomfortable about the situation presented by the boat invitation—drinking alcohol socially with a male professor who made them feel uncomfortable.

20.     Plaintiffs Kirkner and Lorenz had declined approximately ten boat invitations from Defendant Schewe before finally accepting an invitation. Plaintiffs Kirkner and Lorenz finally accepted an invitation because they felt a sense of obligation due to Defendant Schewe's constant invitations and pressure. They felt that they would be safer if they both accepted the invitation at the same time and attended the boat hangout together. Ultimately, Plaintiffs Kirkner and Lorenz both felt that they would face negative repercussions in their academic program if they continued to decline Defendant Schewe's constant and persistent invitations.

21.     At one point on the boat, Plaintiff Kirkner had her camera phone out. Defendant Schewe told Plaintiff Kirkner that he did not want her to post any pictures or photographs that would identify who was on the boat or who Plaintiff Kirkner was with on the boat.

22.     Defendant Schewe made it clear to Plaintiffs Kirkner and Lorenz that his wife was not going to be on the boat, at one point telling Plaintiffs that "the whole point of the boat is to get away from my wife." This comment increased Plaintiffs Kirkner and Lorenz' discomfort with the situation.

23.     Defendant Schewe continued telling Plaintiffs Kirkner and Lorenz inappropriate stories about partying, drinking, and consuming illicit drugs on the boat, particularly cocaine.

24.     Defendant Schewe indicated that there were substances harder than alcohol on the boat. He offered Plaintiffs Kirkner and Lorenz cocaine. Plaintiffs declined the offer.

25.     Plaintiffs Kirkner and Lorenz spent roughly two hours on the boat.

26.     After the August 10, 2016 boat trip, Defendant Schewe continued to regularly invite Plaintiffs Kirkner and Lorenz out to the boat. These invitations were also extended to other students, many of whom eventually attended.

27.     Plaintiffs Kirkner and Lorenz felt that students who kept their relationship with Defendant Schewe academic and professional, and were not willing to socialize and hang out with Defendant Schewe (which typically included consuming alcohol to the point of intoxication) were at a disadvantage in terms of opportunities, advocacy, and funding.

28.     Because of this pressure to socialize with Defendant Schewe, Plaintiff Lorenz attended a second outing on the boat that summer. On this second trip Plaintiff Lorenz brought three friends—two men and one woman. Plaintiff Lorenz's thought process for bringing three friends to the second outing was similar to the thought process behind her and Plaintiff Kirkner attending the first outing together—to create a sense of protection and barrier between themselves and Defendant Schewe's inappropriate behavior.

29.     Plaintiff Kirkner did not attend another outing with Defendant Schewe that summer. She resolved to keep her relationship with Defendant Schewe entirely professional. Following this decision she experienced a reduction in financial awards and assistance that Defendant Schewe was in control of or had influence over.

### *Plaintiff Marlee Fry's September 18, 2016 Visit to Defendant Schewe's Boat*

30.     On September 7, 2016 Plaintiff Fry received an email invitation to have wine and cheese on Defendant Schewe's boat the following day. The invitation also stated that Defendant Schewe would be present on the boat all week and that Plaintiff Fry was welcome to come by at any time. The stated purpose of this boat outing was for Plaintiff Fry and two other graduate students to meet Defendant Schewe and one another because they had not met at orientation.

31.     Plaintiff Fry was the first student to arrive to the boat. Defendant Schewe greeted Plaintiff Fry with a comment on her physical appearance, saying "wow, you look great." Also present on the boat were two of Defendant Schewe's male friends not associated with the UIC Criminology, Law, and Justice Department. Plaintiff Fry could sense that all three men had been drinking for some time and were intoxicated.

32.     When the second graduate student arrived, Defendant Schewe's friends made several more comments about the new student's physical appearance, including how sexually desirable they found her to be. Defendant Schewe did not intervene.

33.     At one point Defendant Schewe's friend, who had made the comments about the other student's appearance, placed one of his fingers into a hole in Plaintiff Fry's jeans while laughing. Plaintiff Fry told him to stop. Again, Defendant Schewe did not intervene.

34.     As he did during the August 10, 2016 boat trip with Plaintiffs Kirkner and Lorenz, Defendant Schewe told Plaintiff Fry that he was on the boat to get away from his wife.

35.     Shortly after more of Defendant Schewe's friends arrived at the boat and because she felt uncomfortable and unsafe, Plaintiff Fry left.

36.     Plaintiff Fry felt severe anxiety after leaving the boat. She was concerned that because she clearly felt uncomfortable and unsafe on the boat and was not engaging in the sexually inappropriate discussion and joking, that this could possibly have negative repercussions for her within the program. This is the similar to the fear that Plaintiffs Kirkner and Lorenz felt when they left Defendant Schewe's boat.

37.     After the September 18, 2016 outing and unlike Plaintiffs Kirkner and Lorenz, Plaintiff Fry was not invited back to Defendant Schewe's boat.

38.     Prior to the September 18, 2016 boat trip, Plaintiff Fry had already been enrolled in a course taught by Defendant Schewe in the upcoming semester. Her next, and final, trip to the boat occurred during a class session in which Defendant Schewe decided to conduct class on the

boat. Although Plaintiff Fry felt uncomfortable with this sudden change due to her previous experience on the boat, she felt compelled to attend as the other students were going and it was part of the class.

39.     Once on the boat, Defendant Schewe failed to seriously teach class. Rather than discuss the reading assignment and class material, which was the original plan, Defendant Schewe proceeded to tell informal stories about his life and expressed disappointment about how he and the students should not drink because it was technically class time.

40.     Plaintiff Fry has limited her interactions and contact with Defendant Schewe as a direct result of her experience on the boat on September 18, 2016. When she has been referred to him for academic or career advice, she has not felt safe doing so.

### Plaintiff Sarah Malone's Visits to Defendant Schewe's Boat

41.     Plaintiff Malone was invited to visit Defendant Schewe on his boat at the harbor on September 22, 2017.

42.     As with the other Plaintiffs, Plaintiff Malone felt compelled to accept the invitation that day because of Defendant Schewe's power over funding and other academic opportunities and because it was clear that Defendant Schewe favored students who socialized with him outside of professional and academic settings. Another woman from the Criminology, Law, and Justice Department was also on the boat that day. Defendant Schewe invited Malone to come back the following evening to meet one of his friends.

43.     The following evening when Plaintiff Malone returned there was a party taking place on the dock.

44.     Defendant Schewe introduced Plaintiff Malone to another man, one his graduate students, and if front of the male graduate student, stated, "I only fuck my students after they've defended [their dissertations]." This comment made Plaintiff Malone feel uncomfortable and unsafe and she left shortly thereafter.

### Defendant Schewe's Sexual Assault of Plaintiff O'Callaghan

45.     On the evening of November 2, 2017 Plaintiff O'Callaghan, Plaintiff Shepp, Plaintiff Malone and her partner, and other UIC students, primarily in the UIC Department of Criminology, Law, and Justice, attended an informal happy hour gathering at a local restaurant and bar ("Beer Bistro") that was arranged and hosted by Defendant Schewe and an additional

graduate student, Almethia Franklin. Dr. Peter Ibarra, another UIC professor was also in attendance.

46.     This outing took place during Plaintiff O'Callaghan's first semester of graduate school.

47.     There was a $5 martini special that night at Beer Bistro. Defendant Schewe and most of the students in attendance drank several drinks, enough to be significantly intoxicated.

48.     Plaintiffs O'Callaghan and Shepp had 5-6 alcoholic drinks each in the roughly three hours spent at Beer Bistro. Plaintiff O'Callaghan had not eaten dinner that evening, which caused her to be even more intoxicated.

49.     Around 10:00 PM, after Dr. Ibarra and some of the students had left, a smaller group remained, including Plaintiff O'Callaghan, Plaintiff Shepp, Plaintiff Malone, Plaintiff Malone's partner, Almethia Franklin, Jorge Mantilla,  and Defendant Schewe. Defendant Schewe invited the remaining group back to his apartment to continue drinking and socializing.

50.     Defendant Schewe drove Plaintiff O'Callaghan, Plaintiff Shepp (who were considerably intoxicated themselves), and another graduate student to his apartment. Plaintiff Malone, her partner, and the rest of the group drove in a separate vehicle.

51.     As soon as Plaintiff O'Callaghan, Plaintiff Shepp, and others entered Defendant Schewe's apartment, Defendant Schewe began pressuring alcohol upon everyone in attendance.

52.     Defendant Schewe brought out marijuana and marijuana edibles and offered it to all of the guests.  Defendant Schewe insisted that Plaintiff Shepp consume marijuana, hovering over her until she participated.

53.     Plaintiff Shepp expressed discomfort at the idea of her graduate advisor and Director of Graduate Studies offering her marijuana, and indicated that it was inappropriate for her adviser to do so.  Defendant Schewe responded that that is how it should be.

54.     At one point during the evening, Defendant Schewe invited Plaintiff O'Callaghan into his laundry room, telling her that he wanted her to sample of a homemade wine that was being made. Once in the laundry room, Defendant Schewe moved closer to Plaintiff O'Callaghan and made a physical advance, placing his hand on her back. Plaintiff O'Callaghan then moved away and suggested that they go back to the living room with the rest of the guests.

55.     Between the time the group arrived at the apartment and Plaintiff O'Callaghan's sexual assault, Plaintiff O'Callaghan consumed one to two alcoholic beverages, with Defendant Schewe's encouragement.

56.     Once back in the living room among the other guests, Defendant Schewe continued to maintain close proximity to Plaintiff O'Callaghan, including sitting directly next to her on the couch. While seated on the couch next to one another, Defendant Schewe placed his arm around Plaintiff O'Callaghan's waist, then reached his hand up the back of her shirt, under the back of her bra, and began rubbing her back. Plaintiff Malone witnessed Defendant Schewe's hand on Plaintiff O'Callaghan's back. Plaintiff Malone's partner also witnessed Defendant Schewe's hand on Plaintiff O'Callaghan's back and under her shirt.

57.     Plaintiff O'Callaghan's intoxication, fear of causing a scene in Defendant Schewe's apartment, and fear of the power disparity between them caused her to freeze up when Defendant Schewe began touching her back. She did not encourage or reciprocate the back rubbing that Defendant Schewe initiated.

58.     Eventually, while the rest of the group was still socializing, Plaintiff O'Callaghan fell asleep on the couch. The rest of the group went to go get food with plans to return shortly. Plaintiff Shepp checked on Plaintiff O'Callaghan before she left to get food, Plaintiff O'Callaghan was too intoxicated to get up, and was left sleeping on the couch. Defendant Schewe also remained at the apartment.

59.     When Plaintiff Malone and a few others returned to the apartment less than 20 minutes later the lights were no longer on as they had been prior. Plaintiff Malone then saw Defendant Schewe in his underwear near his bedroom. He placed a radio or stereo near the bedroom door with the volume turned up. Plaintiff O'Callaghan was not in sight. The lights in Defendant Schewe's bedroom were off.

60.     After seeing Defendant Schewe in his underwear in his apartment with students present, Plaintiff Malone became extremely uncomfortable and left with her partner.

61.     Plaintiff O'Callaghan does not recall how she got to Defendant Schewe's bedroom while the rest of the group went to get food. Plaintiff O'Callaghan does recall that at some point Defendant Schewe entered the bedroom, laughed, rolled her over from her side onto her back, pulled her pants and underwear down, and performed oral sex on her, all without

consent. Plaintiff O'Callaghan blacked out after Defendant Schewe began performing oral sex on her.

62.    Plaintiff O'Callaghan **did not** consent to any form of sexual activity or intercourse with Defendant Schewe. Plaintiff O'Callaghan, due to her intoxication that Defendant Schewe had encouraged all night, **could not** consent to any form of sexual activity.

63.    In Defendant Schewe's telling of the events of the evening of November 2, 2017, as told to the investigators in Defendant UIC's internal investigation, he clearly states that he would have been a willing participant in sexual relations or intercourse with Plaintiff O'Callaghan that evening.

64.    The next morning Plaintiff O'Callaghan woke up. At one point while Plaintiff O'Callaghan laid in the bed she recalls Defendant Schewe placing his arm on her shoulder.

65.    After locating her pants that Defendant Schewe had removed and mustering the courage to get up, Plaintiff O'Callaghan got out of Defendant Schewe's bed and went to the bathroom. Defendant Schewe also got up and began making coffee. He asked her if she felt okay and wanted breakfast. She said that she did not, and hurriedly left Defendant Schewe's apartment. She began crying as soon as she exited, realizing she had been sexually assaulted by her professor.

66.    Plaintiff O'Callaghan's initial inclination was to keep what had happened that morning and previous evening a secret as to not jeopardize her graduate career and future career goal of becoming a professor. This is similar to the calculations that Plaintiffs Kirkner and Lorenz made after experiencing Defendant Schewe's inappropriate behavior on his boat on August 10, 2016.

67.    Defendant O'Callaghan fell into a deep depression in the days immediately following the sexual assault. Her close friends noticed this change in her behavior.

68.    On November 5, the Sunday following the sexual assault, Defendant Schewe sent Plaintiff O'Callaghan an email in which he alluded to engaging in inappropriate, unwanted, and non-consensual sexual relations with Plaintiff. This email reads:

> Hey Erin,
>
> I really want to talk to you, but I'm out of town til Tuesday, so I figured I'd write instead. I'm at my sister's house in Albion Indiana. She's taking a bit of break while I watch her kids. Her oldest son is in home hospice care with hepto-

pulmonary disease, and her youngest has fetal alcohol syndrome. She adopted three special needs children, and has had 2 birth children. Her first birth child was born with spina bifida. She really is an amazing person... but I digress...

When you left on Friday morning, you seemed concerned, perhaps upset, and not just hungover. At first I was confused. But on my drive to Indiana I got to thinking more about it (I can be a very slow thinker). On Thursday night, I thought of us just as two adults sharing time together. I was extremely flattered at the attention you seemed to be showing me. Here you are a smart intelligent person who's going to change the world, and you were paying attention to me. I'm in place in my life right now where I'm craving relationship. It wasn't until later on Friday that I got to thinking. You're a student. I'm a professor. You're young. I'm old. Did I completely misinterpret things?

i feel like I should have been more of an adult that night. That I should have shown more restraint. Talked more and assumed less. Anyways, if you're comfortable sharing, please let me know how you're feeling."

69.     Several of Defendant Schewe's statements in the email directly allude to the fact that he did something he knows to be inappropriate, regrettable, and a violation of Defendant UIC's Comprehensive Policy regarding Dating Violence, Domestic Violence, Stalking and Sexual Assault. Defendant Schewe's email also attempts to blame Plaintiff O'Callaghan for her sexual assault and suggests that the sexual assault was the result of miscommunication or a misunderstanding that was Plaintiff O'Callaghan's fault. These statements include, but are not limited to:

1.   At first I was confused. But on my drive to Indiana I got to thinking more about it (I can be a very slow thinker).

2.   "On Thursday night, I thought of us just as two adults sharing time together. I was extremely flattered at the attention you seemed to be showing me."

3.   "Here you are a smart intelligent person who's going to change the world, and you were paying attention to me."

4.   "I'm in a place in my life right now where I'm craving relationship"

5.   "You're a student. I'm a professor. You're' young. I'm old."

6.   "i feel like I should have been more of an adult that night. That I should have shown more restraint. Talked more and assumed less."

70.     The statement Defendant Schewe makes that he "should have shown more restraint" and "talked more and assumed less" implies that he did something of a physical and

sexual nature that evening that he should have not done. The other statements give a similar impression, as does the apologetic tone.

71.     Unlike Plaintiff O'Callaghan and other Plaintiffs in this Complaint, Defendant Schewe has not kept a consistent and straight story regarding the events of that evening. Witness 8 in Defendant UIC's internal investigation states explicitly that she recalls another student in attendance on the evening of Plaintiff O'Callaghan's assault telling her that Defendant Schewe's story had changed multiple times—shifting from claiming he did not have sex with Plaintiff O'Callaghan, to admitting that he did, to again denying it.

72.     Plaintiff did not respond to Defendant Schewe's email regarding the sexual assault. Receiving the email caused her additional anxiety and stress. Plaintiff O'Callaghan continued to work on Defendant Schewe's grant after her assault because (1) she desperately needed the financial assistance it provided and the chances of finding another comparable grant or fellowship was nonexistent; and (2) because if she refused the grant funding, she likely would have had to explain why, and she wanted to avoid recounting and reliving the assault.

73.     Plaintiff O'Callaghan relied on Plaintiff Kirkner and Plaintiff Shepp to accompany her to grant meetings with Defendant Schewe (they were also on the same grant and reliant on its funding). The presence of Plaintiffs Kirkner and Shepp reduced Plaintiff O'Callaghan's stress and anxiety to a level where she could get through these meetings. Plaintiffs Kirkner and Shepp also kept these meetings on track, as Defendant Schewe had a tendency to go on tangents about other subjects, in order for them to be over as quick as possible.

74.     At one of these meetings Defendant Schewe made a comment about how he would party with R. Kelly if given the opportunity. This comment was made **after** Defendant Schewe had been consulted by an advocate for UIC's Women's Leadership and Resource Center regarding the group's #MuteRKelly campaign, designed to get Defendant UIC to cancel a planned R. Kelly concert following the revelations about his history of sexual assault of underage girls and young women that had been in the national spotlight. Plaintiffs O'Callaghan, Kirkner, and Shepp found Defendant Schewe's comment disturbing given the fact that they were all students studying sexual and gender-related violence and that Defendant Schewe was a professor teaching and researching about these subjects. Given the timing and context, it is difficult to not see this comment as verbal sexual harassment.

75.     Other students, including Plaintiff Shepp, witnessed the negative impact that Defendant Schewe's actions and presence at UIC had on Plaintiff O'Callaghan's life, mental state, and ability to function normally in the days, weeks, and months following the sexual assault.  The Plaintiffs often had to organize their schedules in a manner such that they would have as little contact with Defendant Schewe as possible and scheduled preparatory meetings before and after one did see him.

76.     Plaintiff O'Callaghan's decision to come forward and make an official report regarding her sexual assault came from the realization that she was suffering in silence and no longer felt safe in her own academic department and that Defendant Schewe remained a threat to incoming classes of women who were similar to herself.  In addition, Defendant Schewe was slated to teach a course entitled "Violence and Victimization" and Plaintiff O'Callaghan did not want herself or future students to have to take such a course with Defendant Schewe.

### *Other Instances of Defendant Schewe's Inappropriate Conduct*

77.     At an end of semester party in December of 2016 Defendant Schewe, who was clearly too intoxicated to drive a motor vehicle, offered to drive Plaintiff Lorenz home from the event.

78.     Defendant Schewe has a pattern of behaving inappropriately toward female students while he was intoxicated. Offering to drive female students' home while intoxicated is part of this pattern.

79.     During the fall 2017 semester, Defendant Schewe texted Plaintiff Lorenz a photo of two naked, or almost naked, women. The photograph appeared to be taken from his boat or someone else's boat.

80.     Later that same semester, Plaintiff Lorenz walked into Defendant Schewe's office for a meeting. Defendant Schewe had naked pictures of a woman open on his desktop computer monitor. The images did not appear to be work or research related. The pictures were clearly in view of Plaintiff Lorenz.

81.     Another incident occurred at Plaintiff Lorenz' dissertation defense party which took place on or about September 20, 2017. Defendant Schewe commented to Plaintiff Lorenz' partner that "there are so many women here I want to fuck." Many of the women in attendance at

the party, which included Plaintiff O'Callaghan, Plaintiff Shepp, and Plaintiff Kirker, were graduate students that Defendant Schewe had power over, much like Plaintiff O'Callaghan.

82. Defendant Schewe admitted to Defendant UIC's internal investigators that he has had sexual and/or romantic relationships with former students.

83. Plaintiff Kirkner knows of an undergraduate student who no longer feels safe around Defendant Schewe due to sexually inappropriate comments he made in front of her while on Defendant UIC's campus.

84. Upon graduation, Plaintiff Lorenz had not yet secured post-graduation employment, and thus was in need of income. Defendant Schewe offered her funding for the spring 2018 semester if she delayed her graduation. Plaintiff Lorenz declined this offer, primarily due to Defendant Schewe's constant inappropriate behavior. Plaintiff Lorenz could not tolerate the thought of working with, and under, Defendant Schewe for another semester, and enduring uncomfortable and inappropriate interactions with him. Instead of taking Defendant Schewe's offer for funding and staying in the world of academia and furthering her career opportunities, Plaintiff Lorenz chose to work a minimum wage job as a restaurant host in order to make ends meet before she secured employment as a professor.

### Actual Notice and Deliberate Indifference

85. At all relevant times, Dr. Sarah Ullman was a Professor of Criminology, Law and Justice and an Affiliate Professor of Psychology at UIC.

86. As a Social Psychologist Dr. Ullman's research, among other things, concerns the impact of sexual assault.

87. At all relevant times, Dr. Ullman was a person with official capacity to take corrective action.

88. Before the Plaintiffs suffered discrimination and harassment and assault as alleged herein, Dr. Ullman had actual notice that Defendant Schewe posed a risk to female students.

89. Before the Plaintiffs suffered the discrimination and harassment and assault as alleged herein, Dr. Ullman notified other authorities, including but not limited to college Dean(s) and/or officials within the Department of Social Sciences or other officials with capacity to take corrective action that Defendant Schewe posed a substantial risk to female students.

90.     Nothing came of Dr. Ullman's complaint to UIC officials about Defendant Schewe's misconduct.

91.     UIC was deliberately indifferent to Dr. Ullman's concerns and took no corrective action.

92.     Even if Dr. Ullman had not reported Schewe's misconduct, Dr. Ullman herself was at all relevant times a person with official capacity to take corrective action.

93.     At all relevant times Danielle Smith was the University of Illinois Criminology Law and Justice Program (CLJ) Business Manager and a person with official capacity to take corrective action.

94.     As Business Manager, Danielle Smith was responsible, among other things, for administration and oversight of the school's various programs.

95.     At all relevant times, Danielle Smith was in a managerial position at UIC and was an official with the capacity to take corrective action.

96.     Prior to Plaintiffs experiencing  the harassment and discrimination alleged herein, Danielle Smith had actual knowledge of Defendant Schewe's propensity for inappropriate behavior with women. Smith had worked closely with Defendant Schewe within the CLJ Department.

97.     Despite her managerial authority, Danielle Smith did not take any corrective action in response to Defendant Schewe's inappropriate behavior.

98.     After learning of Schewe's assault of Plaintiff O'Callaghan, Danielle Smith indicated that she had been worried that Schewe would do something like that to a student.

99.     Prior to the assault of Plaintiff O'Callaghan, Danielle Smith had actual knowledge that Defendant Schewe posed a risk of sexually assaulting female students.

100.     Before Plaintiffs experienced the harassment and discrimination and assault as alleged herein, Smith had actual knowledge of the following:

a.     That Defendant Schewe was 'handsy' and touched female students and/or coworkers inappropriately, especially when he had been drinking alcohol;

b.     That Defendant Schewe made inappropriate sexual comments around co-workers and/or students;

    c.   That on Defendant Schewe's boat, Defendant Schewe pressured female students and/or coworkers to use drugs, including cocaine;

    d.   That in or around November of 2016, Defendant Schewe, she and Dr. Jessica Bird, a visiting professor, attended a professional conference in New Orleans and that during that trip, while waiting at a fried chicken restaurant, Defendant Schewe had inappropriate and unwanted physical contact with her.

    e.   That Defendant Schewe sexually harassed Dr. Jessica Bird while she worked as a visiting Professor in the CLJ Department.

    f.   That Defendant Schewe had created a "phantom" relationship with Dr. Bird and that when Dr. Bird rejected Defendant Schewe's advances, Dr. Schewe continued to represent to colleagues that he was in a relationship with Dr. Bird.

    g.   That Dr. Bird had confronted Defendant Schewe multiple times in order to attempt to get Defendant Schewe to stop his making sexual advances but that Defendant Schewe continued to make sexual advances regardless.

101.    Not only did Danielle Smith have actual knowledge that Defendant Schewe was a risk before he harassed, discriminated against, attacked, and/or retaliated against Plaintiffs, but Smith was also aware of the ongoing harassment, discrimination, and/or retaliation against Plaintiffs themselves.

102.    Prior to the harassment, discrimination, battery, and retaliation that was experienced by Plaintiffs, Danielle Smith as well as other UIC officials with capacity to take corrective action had actual knowledge that Defendant Schewe had sexually harassed Dr. Bird. Danielle Smith, as well as other UIC officials with capacity to take corrective action had actual knowledge for at least a six months period that Defendant Schewe repeatedly professed to others that he was in a relationship with Dr. Bird and that Dr. Bird had been repeatedly denying that she was or wanted to be involved romantically with Defendant Schewe and that Dr. Bird had confronted Defendant Schewe multiple times in an attempt to stop the harassment.

***Defendant UIC's Sexual Misconduct Policy and Defendant UIC's Internal Investigations
of Defendant Schewe***

103.    On August 12, 2018, the six Plaintiffs named in this complaint (Erin O'Callaghan, Veronica Shepp, Katherine Lorenz, Anne Kirkner, Sarah Malone, and Marlee Fry) **separately**

made **six** Title IX complaints to Defendant UIC. While all six complaints concerned the conduct and behavior of Defendant Schewe, each Plaintiffs' complaints reflected their own individual experiences and concerns.

104.    Rather than conducting serious, timely, and thorough investigations of each independent complaint, Defendant UIC, by and through its Title IX Coordinator (Defendant Diaz) and/or Title IX Deputy Coordinator (Defendant Truelove), only moved forward to investigate **two** of these complaints: the complaint made by Plaintiff O'Callaghan and the complaint made by Plaintiff Lorenz.

105.    The remaining four students, Veronica Shepp, Anne Kirkner, Sarah Malone, and Marlee Fry were simply considered "witnesses" in the two investigations that moved forward.

106.    Defendant UIC's Comprehensive Policy regarding Dating Violence, Domestic Violence, Stalking and Sexual Assault defines sexual misconduct. The Policy states, "Sexual misconduct is the term used in this policy to encompass unwanted or unwelcome conduct of a sexual nature that is committed without valid consent."

107.    Defendant UIC's Comprehensive Policy regarding Dating Violence, Domestic Violence, Stalking and Sexual Assault defines sexual harassment. The Policy states,

> "What is Sexual Harassment?
>
> - In employment, sexual harassment is defined as any unwelcome sexual advances, requests for sexual favors, or any conduct of a sexual nature when
>
>   1. submission to such conduct is either explicitly or implicitly made a term or condition of employment; and
>
>   2. submission to or rejection of the conduct is used as a basis for making decisions about employment; or
>
>   3. such conduct interferes with job performance or creates an intimidating, hostile, or offensive working environment."
>
> - In education, sexual harassment is defined as any unwelcome sexual advances or requests for sexual favors made to a student by an executive member, administrative staff, or faculty member; or any conduct of a sexual nature that substantially interferes with the student's educational performance or creates an intimidating, hostile, or offensive working environment.
>
>   A hostile environment may be created through unwelcome, severe or pervasive acts:
>
>   o Sexual advances
>
>   o Fondling

- o Shoulder massages
- o Pinching
- o Grabbing
- o Lewd hand gestures
- o Leering
- o **Suggestive comments**
- o **Off-color jokes**
- o **Comments on physical attributes**
- o **Discussions of sexual exploits**
- o Lewd voicemail messages
- o **Displays of sexually suggestive pictures, photos, cartoons, screen savers**
- o **Lewd e-mails or texts**
- o Sexually suggestive posts on social media
- o Facebook pictures with sexual overtones

The University holds harassers accountable for their actions and issues sanctions consistent with employees' and students' rights.

108.    Defendant UIC's Comprehensive Policy regarding Dating Violence, Domestic Violence, Stalking and Sexual Assault defines consent. The Policy states,

"Consent means clear and unambiguous agreement by a competent person that is freely given and expressed in mutually understandable words or actions, to engage in a particular sexual activity with a specific person or persons.

- Consent must be voluntarily given and cannot be the result of force, threats, intimidation and/or coercion (e.g. emotional or psychological pressure);

- A person's lack of verbal or physical resistance or submission resulting from the use of threat of force does not constitute consent;

- A person's manner of dress does not constitute consent;

- A person's consent to past sexual activity does not constitute consent to future sexual activity;

- The absence of a response does not communicate consent;

- A person's consent to engage in sexual activity with one person does not constitute consent to engage in sexual activity with another;

- Consent can be withdrawn by either party at any time;

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

- A person cannot consent to sexual activity if that person is unable to understand the nature of the activity or give knowing consent due to circumstances, including without limitation the following:
  - The person is incapacitated due to the use or influence of alcohol or drugs;
  - The person is asleep or unconscious;
  - The person is under the age of consent;
  - The person is incapacitated due to mental or physical disability."

109.     Defendant UIC's Comprehensive Policy regarding Dating Violence, Domestic Violence, Stalking and Sexual Assault states that, "The Investigator will make a recommendation of finding with respect to whether consent was given at the time of the incident under investigation based upon the definitions of consent within the policy and the guidance provided by federal and state legislation and regulations."

110.     Defendant UIC's Comprehensive Policy regarding Dating Violence, Domestic Violence, Stalking and Sexual Assault states that internal investigators will use a preponderance of evidence standard, meaning that determinations are to be based on whether it is more likely than not that "the alleged conduct constitutes a violation of the UIC Sexual Misconduct Policy."

111.     Defendant Schewe violated Defendant UIC's Comprehensive Policy regarding Dating Violence, Domestic Violence, Stalking and Sexual Assault on countless occasions, just in regards to the six Plaintiffs in this Complaint.

112.     Examples of Defendant Schewe violated Defendant UIC's Comprehensive Policy regarding Dating Violence, Domestic Violence, Stalking and Sexual Assault included in this Complaint include, but are not limited to:

- constantly offering to drive female students home while he was intoxicated;
- offering Plaintiffs Kirkner and Lorenz cocaine on his boat;
- making a comment on Plaintiff Fry's physical appearance;
- making comments about another student's physical appearance and sexual desirability in Plaintiff Fry's presence;
- making the inappropriate comment, "I only fuck my students after they've defended [their dissertations]," when introducing Plaintiff Malone to one of his friends at the boat dock;

- making the inappropriate comment, "there are so many women in here I want to fuck," to Plaintiff Lorenz' partner at an event which was largely attended by graduate students in his Department;

- text messaging Plaintiff Lorenz a photograph of two nude, or almost nude, women;

- pressuring female students to consume marijuana and marijuana edibles at his home;

- aggressively forcing alcoholic beverages on students, including Plaintiff O'Callaghan;

- making unwanted physical and sexual advances toward Plaintiff O'Callaghan; and

- performing oral sex, and possibly other sexual acts, on Plaintiff O'Callaghan without her consent and while she was heavily intoxicated (which he admitted to Almethia Franklin);

113.    Despite the multiplicity of witness accounts to Defendant Schewe's behavior on the evening of Plaintiff O'Callaghan's sexual assault, Defendant Schewe's incontrovertible history of sexually inappropriate behavior when dealing with female students, and evidence supporting Plaintiff O'Callaghan's claim of sexual assault (primarily the email Defendant Schewe sent her in which he alludes to wrongdoing), Defendant UIC's internal investigators in the Office for Access and Equity and, Defendants Diaz (Title IX Coordinator) and Truelove (Deputy Title IX Coordinator), using the preponderance of evidence standard, failed to substantiate the majority of Plaintiff O'Callaghan's accurate factual claims, and found Defendant Schewe guilty of no violations of  Defendant UIC's Comprehensive Policy regarding Dating Violence, Domestic Violence, Stalking and Sexual Assault.

114.    The investigation into Plaintiff Lorenz' complaint against Defendant Schewe came to similar, unsatisfactory, conclusions as those in the investigation into Plaintiff O'Callaghan's claims. Defendant UIC's internal investigation decided that Defendant Schewe texting a picture of two almost-nude women to Plaintiff Lorenz, subjecting her to non-research related pornographic imagery on campus, and telling Plaintiff Lorenz' partner that "there are so many women here I want to fuck" at a dissertation party that Plaintiff Lorenz and many other current female graduate students were in attendance to were not violations of Defendant UIC's Comprehensive Policy regarding Dating Violence, Domestic Violence, Stalking and Sexual

Assault. The findings did not include any mention of Defendant Schewe offering Plaintiffs Lorenz and Kirkner cocaine on his boat on the August 10, 2016 boat trip.

115. Despite filing her own independent Title IX complaint against Defendant Schewe, Plaintiff Shepp was simply used as a "witness" in Defendant UIC's investigations.

116. Despite filing her own independent Title IX complaint against Defendant Schewe, Plaintiff Kirkner was simply used as a "witness" in Defendant UIC's investigations.

117. Despite filing her own independent Title IX complaint against Defendant Schewe, Plaintiff Fry was simply used as a "witness" in Defendant UIC's investigations.

### *Impact of Defendant Schewe's Misconduct on Plaintiffs' Education, Employment, and Lives*

118. Plaintiff O'Callaghan has suffered, and continues to suffer, the mental, emotional, and psychological distress that accompanies being a victim of a sexual assault. Plaintiff O'Callaghan has suffered severe anxiety and panic attacks as a result of Defendant Schewe's actions on the evening of November 2, 2017. The finding from Defendant UIC's internal investigation that failed to substantiate her factual allegations and failed to find Defendant Schewe in violation of Defendant UIC's Comprehensive Policy regarding Dating Violence, Domestic Violence, Stalking and Sexual Assault has also contributed to these stressors.

119. Plaintiff O'Callaghan does not feel safe in Defendant UIC's Criminology, Law, and Justice Department as a proximate result of Defendant Schewe's sexual assault committed against her, as well as the sexually predatory behavior he has exhibited toward other Plaintiffs. Put simply, Plaintiff O'Callaghan has been robbed of a safe educational environment that students are promised when they attend a federally-funded public university—Plaintiff O'Callaghan has been forced to endure a sexually hostile environment since the night of her assault.

120. Additionally, that Defendant UIC, Defendant Diaz, and/or Defendant Truelove failed to find any of Defendant Schewe's behavior on the evening of November 2, 2017 to be in violation of Defendant UIC's Comprehensive Policy regarding Dating Violence, Domestic Violence, Stalking and Sexual Assault is absurd and has directly contributed to the hostile environment that Plaintiff O'Callaghan has been forced to endure, in addition to the effects of her sexual assault.

121.     Plaintiff Shepp has been robbed of a safe educational environment, free from sexual harassment, sexual hostility, and gender discrimination that students are promised when they attend a federally-funded public university. Plaintiff Shepp has been forced to endure a sexually hostile environment.

122.     Additionally, Defendant UIC's, Defendant Diaz's, and/or Defendant Truelove's decision to not move forward with Plaintiff Shepp's report to the Defendant UIC's Title IX concerning Defendant Schewe's inappropriate behavior and sexual misconduct (thus minimizing her complaint) has contributed to the hostile environment that Plaintiff Shepp has been forced to endure.

123.     Plaintiff Lorenz did not feel safe in Defendant UIC's Criminology, Law, and Justice Department as a proximate result of Defendant Schewe's sexually inappropriate behavior that was directed at her, as well as the sexually predatory behavior he has exhibited toward other Plaintiffs. Put simply, Plaintiff Lorenz was robbed of a safe educational environment that students are promised when they attend a federally-funded public university—Plaintiff Lorenz was forced to endure a sexually hostile environment since the night she was assaulted.

124.     Additionally, that Defendant UIC, Defendant Diaz, and/or Defendant Truelove failed to find any of Defendant Schewe's behavior on August 10, 2016 to be in violation of Defendant UIC's Comprehensive Policy regarding Dating Violence, Domestic Violence, Stalking and Sexual Assault is absurd and has directly contributed to the hostile environment that Plaintiff Lorenz was forced to endure, in addition to the effects of the sexual harassment.

125.     Plaintiff Kirkner has been robbed of a safe educational environment, free from sexual harassment, sexual hostility, and gender discrimination that students are promised when they attend a federally-funded public university. Plaintiff Kirkner has been forced to endure a sexually hostile environment since the night of her assault.

126.     Additionally, Defendant UIC's, Defendant Diaz's, and/or Defendant Truelove's decision to not move forward with Plaintiff Kirkner's report to the Defendant UIC's Title IX concerning Defendant Schewe's inappropriate behavior and sexual misconduct (thus minimizing her complaint) has contributed to the hostile environment that Plaintiff Kirkner has been forced to endure.

127.     Plaintiff Malone has been robbed of a safe educational environment, free from sexual harassment, sexual hostility, and gender discrimination that students are promised when they attend a federally-funded public university. Plaintiff Malone has been forced to endure a sexually hostile environment.

128.     Additionally, Defendant UIC's, Defendant Diaz's, and/or Defendant Truelove's decision to not move forward with each students' reports to the Defendant UIC's Title IX concerning Defendant Schewe's inappropriate behavior and sexual misconduct (thus minimizing her complaint) has contributed to the hostile environment that Plaintiff Malone has been forced to endure.

129.     Plaintiff Fry has been robbed of a safe educational environment, free from sexual harassment, sexual hostility, and gender discrimination that students are promised when they attend a federally-funded public university. Plaintiff Fry has been forced to endure a sexually hostile environment.

130.     Additionally, Defendant UIC's, Defendant Diaz's, and/or Defendant Truelove's decision to not move forward with Plaintiff Fry's report to the Defendant UIC's Title IX concerning Defendant Schewe's inappropriate behavior and sexual misconduct (thus minimizing her complaint) has contributed to the hostile environment that Plaintiff Fry has been forced to endure.

## **LEGAL CLAIMS**

### **FIRST CLAIM FOR RELIEF**
### **AGAINST DEFENDANT UIC**
### **Title IX**
### **(As to All Plaintiffs)**

131.     Plaintiffs re-allege all prior paragraphs of the First Amended Complaint as if set out here in full.

132.     At all relevant times, Defendant UIC received federal funding and assistance.

133.     The physical, verbal, and behavioral conduct by Defendant Schewe was of a sexual nature and was unwelcome and sufficiently severe or pervasive from both a subjective and objective viewpoint such that the conduct had the purpose or effect of unreasonably interfering with Plaintiffs' work or academic performance or creating an intimidating, hostile, or offensive environment for working, learning, or living on campus.

134.     The environment created from the conduct of Defendant Schewe was hostile based on the circumstances, including but not limited to the frequency of the conduct, the nature and severity of the conduct, the relationship between the parties, the location and context in which the conduct occurred, and the physically threatening and humiliating nature of the conduct.

135.     For years before the Plaintiffs experienced the harm as described herein, UIC officials had actual knowledge that Defendant Schewe violated Defendant UIC's Comprehensive Policy regarding Dating Violence, Domestic Violence, Stalking and Sexual Assault and had actual knowledge that Defendant Schewe posed a risk to female students yet UIC officials had taken no steps to take any corrective action.

136.     Defendant UIC's officials had actual knowledge of Defendant Schewe's inappropriate behavior for a significant period of time before the harm that Plaintiffs experienced and during the harm that Plaintiffs were experiencing, yet none of the officials took any steps towards any corrective action or made any effort to protect students from the harm.

137.     Defendant UIC's deliberate indifference to Defendant Schewe's conduct as described herein was malicious, oppressive, or in reckless disregard of Plaintiffs' rights such that punitive damages are appropriate.

138.     As a result of the foregoing, Plaintiffs' have suffered extensive damages and have lost educational opportunities and have been unable to continue their courses of study and have missed opportunities for classes, deprived of equal access to education.

### SECOND CLAIM FOR RELIEF
### AGAINST DEFENDANT UIC
### Deliberate Indifference Resulting in Unwanted Sexual Contact in Violation of Title IX
### (As to Plaintiff O'Callaghan)

139.     Plaintiff O'Callaghan re-alleges all prior paragraphs of the First Amended Complaint as if set out here in full.

140.     At all relevant times, Defendant UIC received federal funding and assistance.

141.     Plaintiff O'Callaghan was subjected to sexual contact that was so severe, pervasive, and/or objectively offensive that it deprived her of access to educational opportunities and benefits.

142.    The physical contact committed by Defendant Schewe on the body of Plaintiff O'Callaghan was committed while he was Plaintiff O'Callaghan's professor and supervisor, and as an employee of Defendant UIC.

143.    Defendant Schewe has engaged in a pattern of exploiting females who are subordinate to him by virtue of their student status and/or their junior employment status.

144.    The physical contact that Defendant Schewe intentionally made with Plaintiff O'Callaghan was intentional contact and included (but was not limited to) rubbing and/or groping Plaintiff O'Callaghan on her back and performing nonconsensual oral sex on Plaintiff O'Callaghan while she was partially unconscious.  Given the extent of this physical touching, the locations on Plaintiff O'Callaghan's body touched by Defendant Schewe and the manner of the touching by Defendant Schewe, it was clearly sexual in nature.

145.    Plaintiff O'Callaghan did not consent to Defendant Schewe's touching her in a sexual manner.

146.    Defendant Schewe was in a direct supervisory and evaluative role over Plaintiff O'Callaghan.

147.    Defendant Schewe's conduct toward Plaintiff O'Callaghan at his apartment on the evening of November 2, 2017 constitutes nonconsensual sexual contact with Plaintiff O'Callaghan.

148.    The non-consensual physical contact violated Defendant UIC's Comprehensive Policy regarding Dating Violence, Domestic Violence, Stalking and Sexual Assault.

149.    Defendant Schewe's propensity for engaging in sexually inappropriate conduct directed at female graduate students was actually known by officials in Defendant UIC's Criminology, Law, and Justice Department prior to the assault. Defendant UIC was deliberately indifferent to this actual knowledge prior to Plaintiff O'Callaghan's sexual assault on the evening of November 2, 2017.

150.    Defendant UIC's deliberate indifference was clearly unreasonable.

151.    Defendant UIC's conduct as described herein was malicious, oppressive, or in reckless disregard of Plaintiff O'Callaghan's rights such that punitive damages are appropriate.

152.    As a result of the foregoing, Plaintiff O'Callaghan has suffered extensive damages.

**THIRD CLAIM FOR RELIEF**
**AGAINST DEFENDANT UIC**
**Erroneous Outcome in Violation of Title IX**
**(As to Plaintiff O'Callaghan)**

153.     Plaintiff O'Callaghan re-alleges all prior paragraphs of the First Amended Complaint as if set out here in full.

154.     University of Illinois at Chicago is a public university. UIC is an educational institution as that term is defined in 20 U.S.C. §1681. UIC is a recipient of federal financial assistance for its educational programs and activities.

155.     Plaintiff O'Callaghan is a student and employee of UIC, and participated in educational programs or activities that were direct or indirect beneficiaries of federal financial assistance. Plaintiff O'Callaghan is protected from discrimination on the basis of her gender under 20 U.S.C. §1681 and implementing regulations, 34 C.F.R. Part 106.

156.     The regulations and guidance under Title IX require fair and impartial investigation of complaints of sexual harassment or related misconduct.

157.     Defendant UIC subjected Plaintiff O'Callaghan to unlawful discrimination and deliberate indifference on the basis of her gender by failing to substantiate her allegations that were supported by a bevy of witnesses, failing to substantiate her allegation of sexual assault, discounting evidence supporting her allegation of sexual assault (including two admissions by Defendant Schewe), and overall finding in favor of Defendant Schewe in the internal investigation.

158.     Defendant UIC violated Title IX because the outcome of the internal investigation into Plaintiff O'Callaghan's report of sexual assault at the hands of Defendant Schewe was incorrect given the witness testimony, evidence, and admissions of sexual wrongdoing by Defendant Schewe.

159.     By erroneously ruling in favor of Defendant Schewe, Defendant UIC violated Defendant UIC's Comprehensive Policy regarding Dating Violence, Domestic Violence, Stalking and Sexual Assault and Title IX.

160.     Defendant UIC and its employees unlawfully failed to exercise the authority to institute corrective measures to remedy, and exhibited deliberate indifference by refusing to remedy: (a) Defendant UIC's violations of Plaintiff O'Callaghan's rights under Defendant UIC's

Comprehensive Policy regarding Dating Violence, Domestic Violence, Stalking and Sexual Assault and Title IX; and/or Defendant UIC's erroneous determination that Defendant Schewe did not violate Defendant UIC's Comprehensive Policy regarding Dating Violence, Domestic Violence, Stalking and Sexual Assault which Defendant UIC adopted pursuant to federal laws and regulations related to Title IX.

161.     The conduct of Defendant UIC and its employees involved arbitrary and capricious violations of Plaintiff O'Callaghan's Constitutional Due Process rights.

162.     Defendant UIC's discrimination and deliberate indifference against Plaintiff O'Callaghan is in violation of Title IX, and entitles Plaintiff O'Callaghan to damages. Plaintiff O'Callaghan has suffered severe and substantial damages, diminished earning capacity, lost career opportunities, litigation expenses (including attorneys' fees), loss of reputation, humiliation, embarrassment, mental and emotional anguish, and other compensatory damages.

163.     Defendant UIC is liable to Plaintiff O'Callaghan for damages under Title IX. Defendant UIC's treatment of Plaintiff O'Callaghan has been intentional, willful and malicious, and entitles Plaintiff O'Callaghan to an award of punitive damages.

### FORTH CLAIM FOR RELIEF
### AGAINST DEFENDANT UIC
### Erroneous Outcome in Violation of Title IX
### (As to Plaintiff Lorenz)

164.     Plaintiff Lorenz re-alleges all prior paragraphs of the First Amended Complaint as if set out here in full.

165.     University of Illinois at Chicago is a public university. UIC is an educational institution as that term is defined in 20 U.S.C. §1681. UIC is a recipient of federal financial assistance for its educational programs and activities.

166.     Plaintiff Lorenz was a student and employee of UIC, and participated in educational programs or activities that were direct or indirect beneficiaries of federal financial assistance. Plaintiff Lorenz is protected from discrimination on the basis of her gender under 20 U.S.C. §1681 and implementing regulations, 34 C.F.R. Part 106.

167.     The regulations and guidance under Title IX require fair and impartial investigation of complaints of sexual harassment or related misconduct.

168.    Defendant UIC subjected Plaintiff Lorenz to unlawful discrimination and deliberate indifference on the basis of her gender by failing to substantiate her allegations that were supported by a bevy of witnesses, failing to substantiate her allegation of sexual harassment, discounting evidence supporting her allegation of sexual harassment, and overall finding in favor of Defendant Schewe in the internal investigation.

169.    Defendant UIC violated Title IX because the outcome of the internal investigation into Plaintiff Lorenz' report of sexual harassment at the hands of Defendant Schewe was incorrect given the witness testimony and evidence which all supported Plaintiff Lorenz' claims.

170.    By erroneously ruling in favor of Defendant Schewe, Defendant UIC violated Defendant UIC's Comprehensive Policy regarding Dating Violence, Domestic Violence, Stalking and Sexual Assault and Title IX.

171.    Defendant UIC and its employees unlawfully failed to exercise the authority to institute corrective measures to remedy, and exhibited deliberate indifference by refusing to remedy: (a) Defendant UIC's violations of Plaintiff Lorenz' rights under Defendant UIC's Comprehensive Policy regarding Dating Violence, Domestic Violence, Stalking and Sexual Assault and Title IX; and/or Defendant UIC's erroneous determination that Defendant Schewe did not violate Defendant UIC's Comprehensive Policy regarding Dating Violence, Domestic Violence, Stalking and Sexual Assault which Defendant UIC adopted pursuant to federal laws and regulations related to Title IX.

172.    The conduct of Defendant UIC and its employees involved arbitrary and capricious violations of Plaintiff Lorenz Constitutional Due Process rights.

173.    Defendant UIC's discrimination and deliberate indifference against Plaintiff Lorenz is in violation of Title IX, and entitles Plaintiff Lorenz to damages. Plaintiff Lorenz has suffered severe and substantial damages, diminished earning capacity, lost career opportunities, litigation expenses (including attorneys' fees), loss of reputation, humiliation, embarrassment, mental and emotional anguish, and other compensatory damages.

174.    Defendant UIC is liable to Plaintiff Lorenz for damages under Title IX. Defendant UIC's treatment of Plaintiff Lorenz has been intentional, willful and malicious, and entitles Plaintiff Lorenz to an award of punitive damages.

**FIFTH CLAIM FOR RELIEF**
**AGAINST DEFENDANT SCHEWE**

**Sexual Harassment in Violation of the Fourteenth Amendment to the Constitution of the
United States of America
(Pursuant to 42 U.S.C. § 1983)
(As to Plaintiffs Kirkner, Lorenz, Malone, and Fry)**

175.     Plaintiffs re-allege all prior paragraphs of the First Amended Complaint as if set
out here in full.

176.     Under the Fourteenth Amendment, Plaintiffs had the right as public university
students to personal security and bodily integrity and Equal Protection of Laws.

177.     Defendant Schewe sexually harassed Plaintiffs Kirkner, Lorenz, Malone, and Fry
while he was a state actor acting in his individual capacity under the color of state law.

178.     Defendant Schewe subjected Plaintiffs Kirkner, Lorenz, Malone, and Fry to
violations of their right to personal security and bodily integrity and Equal Protection of Laws by
subjecting them each to egregious sexual harassment while Plaintiffs were visiting Defendant
Schewe's boat on the occasions included, but not limited to, in the General Allegations section of
this Complaint.

179.     Defendant Schewe subjected Plaintiffs to sexual harassment that was so severe
and objectively offensive that it violated Plaintiffs' constitutional rights.

180.     Defendant Schewe was in a direct supervisory and evaluative role over Plaintiffs
Kirkner, Lorenz, Malone, and Fry.

181.     Defendant Schewe's conduct constituted disparate treatment of females and had a
disparate impact on female graduate students.

182.     Plaintiffs have had their academic life and standing disrupted, and have personally
suffered emotional and psychological distress, all as a direct and proximate result of Defendant
Schewe's sexual harassment and continued presence on Defendant UIC's campus.

183.     Defendant Schewe's conduct as described herein violated Plaintiff' clearly
established and articulated constitutional rights of which a reasonable person would have known.

184.     Defendant Schewe's conduct as described herein was malicious, oppressive, or in
reckless disregard of Plaintiffs' rights such that punitive damages are appropriate.

185.     As a result of the foregoing, Plaintiffs have suffered extensive damages.

**SIXTH CLAIM FOR RELIEF
AGAINST DEFENDANT SCHEWE**

**Hostile Environment in Violation of the Fourteenth Amendment to the Constitution of the United States of America Pursuant to 42 U.S.C. § 1983
(As to all Plaintiffs)**

186.    Plaintiffs re-allege all prior paragraphs of the First Amended Complaint as if set out here in full.

187.    Under the Fourteenth Amendment, Plaintiffs had the right as public university students to personal security, bodily integrity, and Equal Protection of Laws.

188.    Defendant Schewe sexually harassed Plaintiffs O'Callaghan, Shepp, Lorenz, Kirkner, Malone, and Fry while he was a state actor acting in his individual capacity under the color of state law.

189.    Defendant Schewe engaged in non-consensual sexual contact with Plaintiff O'Callaghan, while she was unconscious and/or otherwise unable to consent, while he was a state actor acting in his individual capacity under the color of state law.

190.    Defendant Schewe subjected Plaintiffs to sexual harassment and unwanted sexual contact that was so severe and objectively offensive that it violated Plaintiffs' constitutional rights.

191.    The physical and verbal conduct committed by Defendant Schewe was of a sexual nature and was unwelcome and sufficiently severe or pervasive from both a subjective and objective viewpoint such that the conduct had the purpose or effect of unreasonably interfering with Plaintiffs' work or academic performance, or creating an intimidating, hostile, or offensive environment for working, learning, or living on campus.

192.    The environment created from Defendant Schewe's conduct was hostile based on the circumstances, including but not limited to the frequency of the conduct, the nature and severity of the conduct, the relationship between the parties, the location and context in which the conduct occurred, and the physically threatening and humiliating nature of the conduct.

193.    The environment resulting from Defendant Schewe's conduct also constitutes a hostile environment.

194.    Defendant Schewe's conduct as described herein violated Plaintiffs' clearly established constitutional rights of which a reasonable person would have known.

195.    Defendant Schewe's conduct as described herein was malicious, oppressive, or in reckless disregard of Plaintiffs' rights such that punitive damages are appropriate.

196.    As a result of the foregoing, Plaintiffs have suffered extensive damages.

**SEVENTH CLAIM FOR RELIEF**
**AGAINST DEFENDANT SCHEWE**
**Negligence**
**(As to Plaintiff O'Callaghan)**

197.    Plaintiff re-alleges all prior paragraphs of the First Amended Complaint as if set out here in full.

198.    In the November 5, 2017 email that Defendant Schewe sent to Plaintiff O'Callaghan, after the sexual assault that took place on November 2, 2017, Defendant Schewe admitted to being attracted to Plaintiff O'Callaghan on the evening of the assault, that he was craving relationship, that there was a power disparity between him and Plaintiff O'Callaghan, that he "should have been more of an adult that night," and that he "should have shown more restraint. Talked more and assumed less."

199.    Defendant Schewe admitted to Almethia Franklin, a witness in Defendant UIC's internal investigation, that he had sexual relations with Plaintiff O'Callaghan on the evening of November 2, 2017.

200.    On or about the evening of November 2, 2017, Defendant Schewe had a duty to exercise due care and caution for the safety of Plaintiff O'Callaghan.

201.    Notwithstanding the aforesaid duty, Defendant Schewe was guilty of one or more of the following negligent and/or reckless acts or omissions:

    a.    Failed to exercise caution towards Plaintiff O'Callaghan;

    b.    Failed to exercise due care in his physical interactions with Plaintiff O'Callaghan;

    c.    Because of his intoxication, engaged in sexual misconduct that included but was not limited to touching of Plaintiff O'Callaghan's body without consent and performing oral sex on Plaintiff O'Callaghan sans consent;

    d.    Because of his intoxication, failed to cease making sexual advances towards Plaintiff O'Callaghan despite her never consenting to these advances;

    e.    While under the influence of alcohol and without any form of consent made repeated sexual advances towards Plaintiff O'Callaghan; and

    f.    While under the influence of alcohol and without any form of consent sexually assaulted Plaintiff O'Callaghan in his apartment.

202.   As a result of one or more of the foregoing negligent acts or omissions, Plaintiff O'Callaghan suffered bodily harm as caused by Defendant Schewe.

203.   As a direct and proximate result of one or more of the aforesaid negligent acts and/or omissions of Defendant Schewe, Plaintiff O'Callaghan has had her life negatively altered, her academic life and standing disrupted, and has personally suffered emotional and psychological distress, all as a direct and proximate result of Defendant Schewe's negligence.

204.   Plaintiff O'Callaghan has lost great gains that would have otherwise been made and acquired, will in the future lose gains she would have made and acquired, and has and continues to be impaired from going about her daily affairs, all to Defendant Schewe's damage.

205.   Plaintiff O'Callaghan reserves the right to seek punitive damages.

### EIGHTH CLAIM FOR RELIEF
### AGAINST DEFENDANT SCHEWE
### Battery
### (As to Plaintiff O'Callaghan)

206.   Plaintiff re-alleges all prior paragraphs of the First Amended Complaint as if set out here in full.

207.   Defendant Schewe's physical contact with Plaintiff O'Callaghan at his apartment on the evening of November 2, 2017 was intentional, offensive, and harmful.

208.   As a result of the offensive physical contact, Plaintiff O'Callaghan suffered significant and ongoing mental and emotional distress.

209.   Plaintiff O'Callaghan did not consent to the offensive physical contact.

210.   As a direct and proximate result of the foregoing battery by Defendant Schewe, Plaintiff O'Callaghan has sustained severe and substantial emotional and/or mental distress and damages, and she is entitled to recover compensatory damages and other damages related thereto.

### NINTH CLAIM FOR RELIEF
### AGAINST DEFENDANT SCHEWE
### Intentional Infliction of Emotional Distress
### (As to Plaintiff O'Callaghan)

211.   Plaintiff re-alleges all prior paragraphs of the First Amended Complaint as if set out here in full.

212. Defendant Schewe was employed in a supervisory position with extensive control and power over Plaintiff O'Callaghan's academic and professional future and acted intentionally to cause Plaintiff O'Callaghan serious, long lasting, and potentially permanent mental, emotional, and psychological stress.

213. Defendant Schewe's conduct as alleged herein was extreme and outrageous.

214. Defendant Schewe's conduct intentionally caused mental and/or emotional injuries to Plaintiff O'Callaghan and/or recklessly disregarded the high probability that his actions would likely result in mental and/or emotional injury and distress to Plaintiff O'Callaghan.

215. Defendant Schewe's conduct is the proximate cause of Plaintiff O'Callaghan's serious mental, emotional, and psychological distress that continues to interfere with her daily life, as well as academic and career advancement.

216. Defendant Schewe, while engaging in the aforementioned conduct, did recklessly inflict and proximately cause substantial mental, emotional, and psychological distress, indignity, embarrassment, and humiliation upon Plaintiff O'Callaghan.

217. As a direct and proximate result of the foregoing intentional infliction of emotional distress by Defendant Schewe, Plaintiff O'Callaghan has sustained severe, substantial, and long lasting emotional and/or mental distress and damages, and she is entitled to recover compensatory damages and other damages related thereto.

218. The mental anguish suffered by Plaintiff O'Callaghan (primarily as a result of the nonconsensual sexual acts committed upon her by Defendant Schewe) was so severe that no reasonable person could be expected to endure it.

219. As a result of the foregoing, Plaintiff O'Callaghan has suffered extensive damages.

### TENTH CLAIM FOR RELIEF
### AGAINST DEFENDANT SCHEWE
### Illinois Gender Violence Act (740 ILCS 82/)
### (As to Plaintiff O'Callaghan)

220. Plaintiff re-alleges all prior paragraphs of the First Amended Complaint as if set out here in full.

221.    The Illinois Gender Violence Act is designed to discourage the type of sexual violence that Defendant Schewe committed against Plaintiff O'Callaghan on the evening of November 2, 2017.

222.    The November 2, 2017 incident against Plaintiff O'Callaghan was gender-related violence committed by Schewe as defined by the Act.

223.    The November 2, 2017 incident was a battery under the laws of Illinois and was committed on the basis of Plaintiff O'Callahan's sex.

224.    The November 2, 2017 incident was a physical intrusion or physical invasion of a sexual nature under coercive conditions satisfying the elements of battery.

225.    Defendant Schewe personally committed the gender-related violence against Plaintiff O'Callaghan.

226.    As a result of the gender based violence, Plaintiff has suffered extensive damages.

### ELEVENTH CLAIM FOR RELIEF
### AGAINST DEFENDANT SCHEWE
**Sexual Harassment in Violation of the Fourteenth Amendment to the Constitution of the United States of America**
**(Pursuant to 42 U.S.C. § 1983)**
**(As to Plaintiff O'Callaghan)**

227.    Plaintiff O'Callaghan re-alleges all prior paragraphs of the First Amended Complaint as if set out here in full.

228.    Under the Fourteenth Amendment, Plaintiff O'Callaghan had the right as a public university student to personal security and bodily integrity and Equal Protection of Laws.

229.    Defendant Schewe sexually harassed Plaintiff O'Callaghan while he was a state actor acting in his individual capacity under the color of state law.

230.    Defendant Schewe subjected Plaintiff O'Callaghan to violations of her right to personal security and bodily integrity and Equal Protection of Laws by subjecting her to egregious sexual harassment on the evening of November 2, 2017.

231.    Defendant Schewe subjected Plaintiff O'Callaghan to sexual harassment and unwanted sexual contact that was so severe and objectively offensive that it violated Plaintiff O'Callaghan's constitutional rights.

232.    The physical contact that Defendant Schewe made with Plaintiff O'Callaghan was intentional contact and included rubbing or groping Plaintiff O'Callaghan on her back and

eventually culminated in a sexual assault on the evening of November 2, 2017. Given the extent of this physical touching, the locations on Plaintiff O'Callaghan body touched by Defendant Schewe, and the manner of the touching by Defendant Schewe, it was sexual in nature.

233.    Plaintiff O'Callaghan did not consent to Defendant Schewe touching her in a sexual manner.

234.    Defendant Schewe was in a direct supervisory and evaluative role over Plaintiff O'Callaghan.

235.    Defendant Schewe engaged in multiple instances of non-consensual sexual contact with Plaintiff O'Callaghan.

236.    Defendant Schewe's behavior on the evening of November 2, 2017 constituted non-consensual contact with Plaintiff O'Callaghan.

237.    Defendant Schewe's conduct constituted disparate treatment of females and had a disparate impact on female students. Male students did not have to attend UIC with the fear of being sexually harassed and/or assaulted by Defendant Schewe.

238.    Plaintiff O'Callaghan has had her academic life and standing disrupted, and has personally suffered emotional and psychological distress, all as a direct and proximate result of Defendant Schewe's sexual harassment.

239.    Defendant Schewe's conduct as described herein violated Plaintiff O'Callaghan's clearly established constitutional rights of which a reasonable person would have known.

240.    Defendant Schewe's conduct as described herein was malicious, oppressive, or in reckless disregard of Plaintiff O'Callaghan's rights such that punitive damages are appropriate.

241.    As a result of the foregoing, Plaintiff O'Callaghan suffered extensive damages.

**TWELTH CLAIM FOR RELIEF**
**AGAINST DEFENDANT SCHEWE**
**Hostile Environment in Violation of the Fourteenth Amendment to the Constitution of the United States of America**
**(Pursuant to 42 U.S.C. § 1983)**
**(As to Plaintiff O'Callaghan)**

242.    Plaintiff O'Callaghan re-alleges all prior paragraphs of the First Amended Complaint as if set out here in full.

243.    Under the Fourteenth Amendment, Plaintiff O'Callaghan had the right as a public university student to personal security and bodily integrity and Equal Protection of Laws.

244.     Defendant Schewe sexually harassed Plaintiff O'Callaghan while he was a state actor acting in his individual capacity under the color of state law.

245.     Defendant Schewe subjected Plaintiff O'Callaghan to sexual harassment and unwanted sexual contact that was so severe and objectively offensive that it violated Plaintiff O'Callaghan's constitutional rights.

246.     The physical and verbal conduct by Defendant Schewe was of a sexual nature and was unwelcome and sufficiently severe or pervasive from both a subjective and objective viewpoint such that the conduct had the purpose or effect of unreasonably interfering with Plaintiff O'Callaghan's work or academic performance or creating an intimidating, hostile, or offensive environment for working, learning, or living on campus.

247.     The environment created from the conduct of Defendant Schewe was hostile based on the circumstances, including but not limited to, the nature and severity of the conduct, the relationship between the parties, the location and context in which the conduct occurred, and the physically threatening and humiliating nature of the conduct.

248.     The environment resulting from Defendant Schewe's sexual assault of Defendant O'Callaghan constitutes a hostile environment:

    a.  Plaintiff O'Callaghan considered not returning to UIC after the assault.

    b.  The resulting investigation (that failed to substantiate her claims) weighed on Plaintiff O'Callaghan heavily.

249.     Defendant Schewe's conduct as described herein violated Plaintiff O'Callaghan's clearly established constitutional rights of which a reasonable person would have known.

250.     Defendant Schewe's conduct as described herein was malicious, oppressive, or in reckless disregard of Plaintiff O'Callaghan's rights such that punitive damages are appropriate.

251.     As a result of the foregoing, Plaintiff O'Callaghan suffered extensive damages.

**THIRTEENTH CLAIM FOR RELIEF**
**AGAINST DEFENDANT DIAZ**
**Violation of Due Process under the United States Constitution**
**(As to Plaintiffs Shepp, Kirkner, and Fry)**

252.     Plaintiffs Shepp, Kirkner, and Fry re-allege all prior paragraphs of the First Amended Complaint as if set out here in full.

253.    At all times relevant herein, Defendant Diaz was acting under color of state law pursuant to 42 U.S.C. § 1983.

254.    Defendant Diaz was employed as Title IX Coordinator in Defendant UIC's Office for Access and Equity during the time of the internal investigation into Plaintiffs' allegations. His actions against Plaintiffs Shepp, Kirkner, and Fry (namely the decision to **not** investigate Plaintiffs' reports concerning Defendant Schewe) were taken within his official capacity as Defendant UIC's Title IX Coordinator.

255.    The decision to not investigate Plaintiffs' reports regarding Defendant Schewe's sexual misconduct contributed to the hostile environment that Plaintiffs' have been forced to endure as graduate students at University of Illinois at Chicago. The decision to not investigate or take their reports and complaints seriously has contributed to the mental, emotional, and psychological stress that Plaintiffs have been subjected to.

256.    As a direct and proximate result of the improper, negligent, and misleading internal investigation conducted, in part, by Defendant Diaz, Plaintiffs have suffered severe and substantial damages, diminished earning capacity, lost career opportunities, litigation expenses (including attorneys' fees), loss of reputation, humiliation, embarrassment, mental and emotional anguish, and other compensatory damages.

### FOURTEENTH CLAIM FOR RELIEF
### AGAINST DEFENDANT DIAZ
### Violation of Due Process under the United States Constitution
### (As to Plaintiff O'Callaghan)

257.    Plaintiff O'Callaghan re-alleges all prior paragraphs of the First Amended Complaint as if set out here in full.

258.    At all times relevant herein, Defendant Diaz was acting under color of state law pursuant to 42 U.S.C. § 1983.

259.    Defendant Diaz was employed as Title IX Coordinator in Defendant UIC's Office for Access and Equity during the time of the internal investigation into Plaintiffs' allegations. His actions against Plaintiff O'Callaghan were taken within her official capacity as Defendant UIC's Title IX Coordinator.

260.    Upon information and belief, Defendant Diaz in his official capacity as Title IX Coordinator led and/or participated in the biased internal investigation and arriving at the

erroneous outcome that Defendant Schewe was innocent of all factual allegations against him and that he did not violate Defendant UIC's Comprehensive Policy regarding Dating Violence, Domestic Violence, Stalking and Sexual Assault.

261.    The internal investigation that Defendant Diaz led and/or participated in that found Defendant Schewe innocent of any wrongdoing in regards to his behavior toward Plaintiff O'Callaghan on the evening of November 2, 2017 directly contributed to the hostile environment that Plaintiff O'Callaghan has been forced to endure as a graduate student at University of Illinois at Chicago. The erroneous internal investigation has contributed to the mental, emotional, and psychological stress that Plaintiff O'Callaghan has been subjected to.

262.    As a direct and proximate result of the improper, negligent, and misleading internal investigation conducted, in part, by Defendant Diaz, Plaintiff O'Callaghan has suffered severe and substantial damages, diminished earning capacity, lost career opportunities, litigation expenses (including attorneys' fees), loss of reputation, humiliation, embarrassment, mental and emotional anguish, and other compensatory damages.

**FIFTEENTH CLAIM FOR RELIEF**
**AGAINST DEFENDANT TRUELOVE**
**Violation of Due Process under the United States Constitution**
**(As to Plaintiffs Shepp, Kirkner, and Fry)**

263.    Plaintiffs Shepp, Kirkner, and Fry re-allege all prior paragraphs of the First Amended Complaint as if set out here in full.

264.    At all times relevant herein, Defendant Truelove was acting under color of state law pursuant to 42 U.S.C. § 1983.

265.    Defendant Truelove was employed as Title IX Deputy Coordinator in Defendant UIC's Office for Access and Equity during the time of the internal investigation into Plaintiffs' allegations. Her actions against Plaintiffs Shepp, Kirkner, and Fry (namely the decision to **not** investigate Plaintiffs' reports concerning Defendant Schewe) were taken within her official capacity as Defendant UIC's Deputy Title IX Coordinator.

266.    Upon information and belief, Defendant Truelove resigned from her position as Defendant UIC's Deputy Title IX Coordinator in May 2019.

267.    The decision to not investigate Plaintiffs' reports regarding Defendant Schewe's sexual misconduct contributed to the hostile environment that Plaintiffs' have been forced to

endure as graduate students at University of Illinois at Chicago. The decision to not investigate or take their reports and complaints seriously has contributed to the mental, emotional, and psychological stress that Plaintiffs have been subjected to.

268.     As a direct and proximate result of the improper, negligent, and misleading internal investigation conducted, in part, by Defendant Truelove, Plaintiffs have suffered severe and substantial damages, diminished earning capacity, lost career opportunities, litigation expenses (including attorneys' fees), loss of reputation, humiliation, embarrassment, mental and emotional anguish, and other compensatory damages.

**SIXTEENTH CLAIM FOR RELIEF**
**AGAINST DEFENDANT TRUELOVE**
**Violation of Due Process under the United States Constitution**
**(As to Plaintiff O'Callaghan)**

269.     Plaintiff O'Callaghan re-alleges all prior paragraphs of the First Amended Complaint as if set out here in full.

270.     At all times relevant herein, Defendant Truelove was acting under color of state law pursuant to 42 U.S.C. § 1983.

271.     Defendant Truelove was employed as Title IX Deputy Coordinator in Defendant UIC's Office for Access and Equity during the time of the internal investigation into Plaintiffs' allegations. Her actions against Plaintiff O'Callaghan were taken within her official capacity as Defendant UIC's Deputy Title IX Coordinator. Defendant Truelove resigned from her position as Defendant UIC's Deputy Title IX Coordinator in May 2019.

272.     Upon information and belief, Defendant Truelove in her official capacity as Title IX Coordinator participated in the biased internal investigation and arriving at the erroneous outcome that Defendant Schewe was innocent of all factual allegations against him and that he did not violate Defendant UIC's Comprehensive Policy regarding Dating Violence, Domestic Violence, Stalking and Sexual Assault.

273.     The internal investigation that Defendant Truelove participated in that found Defendant Schewe innocent of any wrongdoing in regards to his behavior toward Plaintiff O'Callaghan on the evening of November 2, 2017 directly contributed to the hostile environment that Plaintiff O'Callaghan has been forced to endure as a graduate student at University of

Illinois at Chicago. The erroneous internal investigation has contributed to the mental, emotional, and psychological stress that Plaintiff O'Callaghan has been subjected to.

274. As a direct and proximate result of the improper and erroneous internal investigation conducted, in part, by Defendant Truelove, Plaintiff O'Callaghan has suffered severe and substantial damages, diminished earning capacity, lost career opportunities, litigation expenses (including attorneys' fees), loss of reputation, humiliation, embarrassment, mental and emotional anguish, and other compensatory damages.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiffs respectfully demand judgment against Defendants and ask the Court for the following relief:

(a) Damages in amounts to be established at trial, including, without limitation, reimbursement and prepayment for all of Plaintiffs' tuition and related expenses; payment of Plaintiffs' expenses incurred as a consequence of the sexual harassment; damages for deprivation of equal access to the educational benefits and opportunities provided by University of Illinois at Chicago; and damages for past, present and future emotional pain and suffering, ongoing and severe mental anguish, loss of past, present and future enjoyment of life, past, present, and future medical expenses, and lost earnings and earning capacity;

(b) Other Compensatory Damages;

(c) Injunctive relief as this Court deems necessary and proper;

(d) A declaratory judgment that Defendants violated Plaintiffs' Constitutional rights;

(e) That this Court Order Defendant UIC to provide mandatory training for all mandatory reporters using trauma informed principles;

(f) That Defendant Schewe be ordered to comply with the Fourteenth Amendment with respect to Plaintiffs and other female graduate students.

(g) That Defendant UIC be ordered to create a system of reporting sexual misconduct that is less intimidating for the most vulnerable members of the community: students, untenured faculty, and junior faculty.

(h) Other injunctive relief to be determined at trial requiring Defendant UIC to comply with federal law under Title IX;

(i) Pre- and post-judgment interest;

(j) Costs;

(k) Punitive Damages;

(l) Attorney's fees pursuant to all relevant statutes and law including, but not limited to, 42 U.S.C. § 1988(b); and

(m) Such other and further relief as the Court may deem just and proper.

DATED: February 7. 2020            Respectfully submitted,

*s/ Michael L. Fradin*
Attorney for Plaintiffs

LAW OFFICE OF MICHAEL L. FRADIN
Michael L. Fradin, Esq.
8401 Crawford Ave. Ste. 104
Skokie, IL 60076
Telephone: 847-986-5889
Facsimile: 847-673-1228

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed electronically on February 7, 2020. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. The Parties may access this filing through the Court's systems.

s/*Michael L. Fradin*
MICHAEL L. FRADIN (6289502)

Email: mike@fradinlaw.com

FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL