**EXHIBIT A**

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| ERIN O'CALLAGHAN, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 19-cv-06271 |
| ) | |
| UNIVERSITY OF ILLINOIS AT ) | Hon. John J. Tharp, Jr. |
| CHICAGO, et al. ) | |
| ) | |
| Defendants. ) | |

## DEFENDANT UNIVERSITY OF ILLINOIS AT CHICAGO'S
## MOTION TO DISMISS UNDER RULE 12(b)(6) FOR FAILURE TO STATE A CLAIM

Julie B. Porter (No. 6243787)
Katie Hill (No. 6293005)
Sarah Bakker (No. 6316661)
1010 Davis Street
Evanston, IL 60201
P: (312) 283-5711
F: (312) 724-8353
porter@spplawyers.com
hill@spplawyers.com
bakker@spplawyers.com

*Attorneys for Defendant University of Illinois at Chicago*

**INTRODUCTION**

Plaintiffs claim that they experienced inappropriate behavior from their professor Paul Schewe, and Plaintiff Erin O'Callaghan alleges that Schewe sexually assaulted her. The University of Illinois at Chicago prioritizes students' safety.[1] The moment that Plaintiffs informed the University of their concerns, the University immediately placed Schewe on administrative leave and launched thorough investigations. The investigations ultimately concluded that there was insufficient evidence to support a finding that Schewe violated the University's Sexual Misconduct Policy. Now, disagreeing with that result, Plaintiffs sue not only Schewe but also the University and the University's investigators.

Although there are many additional facts that provide important context for what Plaintiffs have alleged, this motion is not about facts. As it must on a Rule 12(b)(6) motion for failure to state a claim, the University assumes for argument's sake that all the facts Plaintiffs allege are true. The problem is that these facts—even if true—do not support the Complaint's legal claims.

Counts 1 through 3 allege that the University was deliberately indifferent to Schewe's purported creation of a hostile environment and sexual harassment. But those counts should be dismissed because Plaintiffs have not alleged—as they must to state a claim—that the University had actual knowledge of Schewe's purported misconduct. Nor do Plaintiffs plausibly allege that the University's response to their claims was clearly unreasonable as a matter of law.

Counts 4 and 5 seek to hold the University liable for reaching "erroneous outcomes" in its investigations. Plaintiffs misapply this cause of action. Although some courts have recognized it, it does not fit under the circumstances that Plaintiffs describe here. Moreover, Plaintiffs have no

---

[1] Plaintiffs have named the University of Illinois at Chicago as a Defendant. The proper entity is the Board of Trustees of the University of Illinois. For this motion's purposes, we refer to this Defendant as "the University."

legal right to their desired outcome in a school investigation, and they have no legitimate cause of action based on their disagreement with the investigators' findings.

Plaintiffs' claims against the University should therefore be dismissed.

## BACKGROUND

### I. The University has policies prohibiting sexual misconduct

The University is a public university in Chicago, Illinois that receives federal funding. Compl. ¶ 7. The University has a Comprehensive Policy regarding Dating Violence, Domestic Violence, Stalking, and Sexual Assault, also referred to as the University Sexual Misconduct Policy. *Id.* ¶ 88. The policy defines "sexual misconduct" as encompassing "unwanted or unwelcome conduct of a sexual nature that is committed without valid consent." *Id.* In education, the University defines "sexual harassment" as:

> …any unwelcome sexual advances or requests for sexual favors made to a student by an executive member, administrative staff, or faculty member; or any conduct of a sexual nature that substantially interferes with the student's educational performance or creates an intimidating, hostile, or offensive working environment.

*Id.* ¶ 89. According to Plaintiffs' Complaint, "hostile environment" may be created through "unwelcome, severe or pervasive acts," including "[s]uggestive comments; [o]ff-color jokes; [c]omments on physical attributes; [d]iscussions of sexual exploits;…[d]isplays of sexually suggestive pictures, photos, cartoons, screen savers; [l]ewd e-mails or texts…." *Id.* Investigators use a preponderance-of-evidence standard to determine whether alleged conduct violates the University's policy. *Id.* ¶¶ 91-92.

### II. Plaintiffs allege that Professor Paul Schewe engaged in inappropriate behavior and sexually assaulted O'Callaghan

Plaintiffs Erin O'Callaghan, Veronica Shepp, Katherine Lorenz, Anne Kirkner, Sarah Malone, and Marlee Fry were graduate students at UIC. *Id.* ¶¶ 1-6. Schewe is a professor in UIC's

2

Department of Criminology, Law, and Justice. *Id.* ¶¶ 8, 13-14. Plaintiffs claim that they are "uncomfortable" in Schewe's presence due to his alleged inappropriate behavior and that they felt pressured to "interact and socialize" with Schewe to facilitate their academic careers. *Id.* ¶ 16.

The Complaint describes Schewe's inappropriate behavior, in summary:

- Kirkner and Lorenz allege that they visited Schewe's boat in summer 2016, and Schewe told "stories about partying, drinking, and consuming illicit drugs on the boat" and offered them cocaine. *Id.* ¶¶ 17-25.

- Schewe continued to invite many students to his boat; Lorenz visited once more in 2016, but Kirkner did not return. *Id.* ¶¶ 26-29. Kirkner claims that she experienced a reduction in financial awards and assistance that Schewe controlled once she stopped interacting socially with Schewe. *Id.* ¶ 29.

- Fry claims that she visited Schewe's boat in September 2016; she alleges that Schewe told her she "look[ed] great," Schewe's friends (who were not affiliated with the University) commented on another female graduate student's appearance, and one of Schewe's friends put his finger in a hole in her jeans while laughing. *Id.* ¶¶ 30-33. Fry alleges that she felt uncomfortable and left, and she was "concerned" that leaving "could possibly have negative repercussions for her within the program." *Id.* ¶ 36. Fry returned when Schewe conducted class on the boat, and she alleges that Schewe "failed to seriously teach class" on that occasion. *Id.* ¶¶ 38-39.

- Malone visited Schewe's boat because, she claims, she felt compelled due to Schewe's power over funding and his purported favoritism towards students who socialized with him. *Id.* ¶ 42. She returned to the boat the following night and alleges that Schewe then

3

- said to a fellow partygoer, "I only fuck my students after they've defended [their dissertations]." *Id.* ¶¶ 43-44.

- O'Callaghan alleges that in November 2017, she, Shepp, Malone, and other students attended a happy hour at a local bar and then proceeded to Schewe's apartment to continue drinking and socializing. *Id.* ¶¶ 45-49. The Complaint claims that Schewe pressured students to drink and consume marijuana at his apartment and that Schewe made physical advances on O'Callaghan. *Id.* ¶¶ 51-56. O'Callaghan further alleges that she was intoxicated, fell asleep on the couch, and ended up in Schewe's bedroom. *Id.* ¶¶ 58, 61. O'Callaghan claims that Schewe pulled down her pants and underwear and performed oral sex on her without her consent. *Id.* ¶ 61. O'Callaghan alleges that she continued to work on Schewe's grant afterwards because she needed the financial assistance and did not want to have to explain and relive what happened. *Id.* ¶ 72.

Plaintiffs allege other instances of inappropriate conduct, including that Schewe offered to drive female students home when he was too intoxicated to drive, texted a photo of an almost-naked woman to Lorenz, had a photo of a naked woman on his computer screen once when Lorenz entered his office, made comments about his desire to have sex with women at a dissertation-defense party, stated that he would party with R. Kelly if given the opportunity, and admitted to having relationships with former students. *Id.* ¶¶ 74, 77-82.

### III. The University immediately investigated Plaintiffs' complaints against Schewe

On August 12, 2018, Plaintiffs complained to the University's Office for Access and Equity about Schewe. *Id.* ¶ 85. Defendant Michael Diaz was the Title IX Coordinator, and Defendant Amy Truelove was the Deputy Title IX Coordinator in the University's Office for Access and Equity. *Id.* ¶¶ 9, 10. Diaz and Truelove investigated Plaintiffs' complaints against Schewe. To do

4

so, they opened formal investigations concerning O'Callaghan's and Lorenz's complaints and considered Shepp, Kirkner, Malone, and Fry to be witnesses in the two investigations. *Id.* ¶¶ 86-87.

The Complaint notes that the investigators interviewed numerous witnesses (including all six Plaintiffs, Schewe, and third-party witnesses), considered evidence, and reached conclusions based on the preponderance-of-evidence standard. *See, e.g.*, *id.* ¶¶ 71 (at least eight witnesses interviewed in investigation), 95 ("multiplicity of witness accounts"), 148 ("bevy of witnesses"), 190 (third-party witness to investigation). The investigation reports themselves—which are referenced in Plaintiffs' Complaint and are central to the case—state that, for the O'Callaghan complaint, investigators interviewed O'Callaghan, Schewe, and ten witnesses, and accepted a written statement from an eleventh witness. Ex. A at 2. Both O'Callaghan and Schewe provided documents for the investigation and had the opportunity to review all the evidence and provide comments and additional evidence. *Id.* For the Lorenz complaint, investigators interviewed Lorenz, Schewe, and seven witnesses. Ex. B at 1. Lorenz and Schewe provided documents for the investigation and had the opportunity to review all the evidence and provide comments and additional evidence, and the University also caused a digital and computer forensic-examination company to examine Schewe's computer. *Id.*

The investigators specifically reviewed each of O'Callaghan's and Lorenz's allegations, reported whether the allegations were substantiated based on a preponderance of the evidence, and explained their findings about whether the substantiated allegations constituted a violation of the University's Sexual Misconduct Policy. Ex. A at 2-10; Ex. B at 2-4. As to O'Callaghan, the investigators undertook a detailed analysis of whether the conduct at issue constituted sexual misconduct under the University's policies. Ex. A at 7-10. The investigators did the same for

5

Lorenz's complaint. Ex. B at 3-4. The investigation into O'Callaghan's complaint did not substantiate the majority of O'Callaghan's factual claims and did not find that Schewe had violated the University's Sexual Misconduct Policy. Compl. ¶ 95. According to Plaintiffs, the investigation into Lorenz's complaint "came to similar, unsatisfactory, conclusions." *Id.* ¶ 96.

Plaintiffs contend that, as a result of Schewe's alleged misconduct, they do not feel safe at the University and have endured a sexually hostile environment. *Id.* ¶¶ 101-11. They further allege that Diaz and Truelove's investigations contributed to their stress. *Id.* ¶¶ 100-12. Plaintiffs sued, asserting among other claims that the University was deliberately indifferent to Schewe's conduct and reached erroneous outcomes in its investigations of that conduct.

## ARGUMENT

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). Although the complaint need not contain "detailed factual allegations," it must allege facts sufficient "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

In deciding a Rule 12(b)(6) motion to dismiss, the court is not limited to the complaint's four corners. The incorporation-by-reference doctrine permits a court to consider extraneous documents when they are referred to in the complaint and are central to the plaintiff's claim. *Adams v. City of Indianapolis*, 742 F.3d 720, 729 (7th Cir. 2014) (affirming district court's reliance on documents outside the pleadings on 12(b)(6) motion where such documents were referenced in complaint and key to plaintiffs' claims).

6

### I. Plaintiffs' Title IX claims against the University fail because Plaintiffs do not allege that the University had actual knowledge of and was deliberately indifferent to Schewe's conduct

In Counts 1, 2, and 3, Plaintiffs claim that the University was deliberately indifferent to Schewe's conduct and that the University's indifference resulted in a hostile environment for all Plaintiffs and in sexual harassment against O'Callaghan.[2] According to Plaintiffs, Schewe's "inappropriate behavior" was "common knowledge amongst graduate students within the University's Criminology, Law, and Justice department," and the University "should have reasonably been aware" of Schewe's behavior. Compl. ¶¶ 118, 141; *see also id.* ¶ 132 ("the University was deliberately indifferent to this common knowledge…").

The University cannot be held liable for Schewe's actions simply because it employed him. *See Doe v. St. Francis Sch. Dist.*, 694 F.3d 869, 871 (7th Cir. 2012) (*respondeat superior* theory cannot support Title IX claim). For a university to be liable under Title IX, the university's officials must have: (1) had actual knowledge of misconduct that created a serious risk to students, and (2) responded with deliberate indifference to the misconduct. *See id.; see also Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 277 (1998) (when Title IX claim is based on teacher's alleged misconduct, plaintiff must prove school's actual notice of and deliberate indifference to that misconduct); *Hansen v. Bd. of Trustees of Hamilton Se. Sch. Corp.*, 551 F.3d 599, 605 (7th Cir. 2008) (same). That is, for the University to be liable, it must have actually known about Schewe's actions and made an official decision not to do anything about Schewe's misconduct. *See Gebser*, 524 U.S. at 290-91 (explaining why actual-notice standard is necessary in Title IX actions involving alleged misconduct by school employees). Plaintiffs' Title IX claims against the

---

[2] The University does not concede that the facts Plaintiffs allege in Count 1, if true, constitute a hostile environment under the law. For purposes of this motion, however, the University focuses solely on the actual-knowledge and deliberate-indifference requirements for Counts 1-3.

University should be dismissed, because they do not sufficiently allege either actual knowledge or deliberate indifference.

### A. Plaintiffs do not allege that the University had actual knowledge of Schewe's actions

Plaintiffs do not allege that the University had actual knowledge of Schewe's alleged misconduct before they complained in August 2018. They assert in Count 1 that Schewe's "inappropriate behavior" was "common knowledge" amongst graduate students and that the University "should have reasonably been aware" of it. Compl. ¶ 118. But the Supreme Court expressly rejected a should-have-known standard in favor of the more stringent actual-knowledge standard for Title IX claims. *See Gebser*, 524 U.S. at 277 ("damages may not be recovered [under Title IX] unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct").

In *Delgado v. Stegall*, 367 F.3d 668 (7th Cir. 2004), abrogated on other grounds by *Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246 (2009), the Seventh Circuit held that under *Gebser*, the school's actual knowledge must be specific: "[U]nder the Supreme Court's formula, the plaintiff in a Title IX damages suit based on a teacher's behavior must prove actual knowledge of misconduct, not just actual knowledge of the risk of misconduct, and must also prove that the officials having that knowledge decided not to act on it." 367 F.3d at 672. The risks must be "so great that they are almost certain to materialize if nothing is done." *Id.* (affirming summary judgment for university where plaintiff alleged sexual harassment by professor, but university did not know professor to be a "serial harasser"). This was the key issue in another Seventh Circuit case, *Doe v. St. Francis Sch. Dist.*, 694 F.3d 869 (7th Cir. 2012). There, an eighth grader sued his school district under Title IX after suffering sexual abuse by his teacher. *Id.* at 870. The teacher's

8

colleagues had complained to the superintendent that the teacher "blurred the line" by treating students as friends, and the superintendent was aware of one colleague's belief that the student had a crush on the teacher. *Id.* at 872. But this was insufficient to impose Title IX liability on the school: "[T]o know that someone suspects something is not to know the something and does not mean the something is obvious." *Id.*; *see also Doe v. Galster*, 768 F.3d 611, 617-18 (7th Cir. 2014) ("The standard set out in *Davis* is not satisfied by knowledge that something might be happening and could be uncovered by further investigation. The standard is 'actual knowledge.' School administrators have actual knowledge only of the incidents that they witness or that have been reported to them.").

Here, in Count 1, Plaintiffs do not claim—and could not legitimately claim—that anyone with authority over Schewe had actual knowledge of misconduct by Schewe that created a serious risk to students. They allege, instead, that Schewe's "inappropriate behavior" was known to graduate students and should have been known to the University, Compl. ¶ 118, which is insufficient to state a Title IX claim.

In Counts 2 and 3, which focus on Schewe's alleged sexual assault of O'Callaghan, Plaintiffs say that "Schewe's propensity for engaging in sexually inappropriate conduct directed at female graduate students was well known within Defendant UIC's Criminology, Law, and Justice Department." *Id.* ¶¶ 132, 141. This, too, falls far short. Plaintiffs do not allege—and again, they could not fairly allege—that the University knew that Schewe had sexually assaulted a student or was at great risk of doing so. Nor do they allege that the University had actual knowledge of any other severe sexual harassment of the type that O'Callaghan now alleges about Schewe. Count 2 and 3's allegations are likewise insufficient to state a Title IX claim against the University.

9

### B. Plaintiffs do not credibly allege deliberate indifference

Plaintiffs assert that the University was deliberately indifferent. *Id.* ¶¶ 119, 133, 142. But just using those words is not enough; Plaintiffs must plead facts to support this legal label. *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."); *Panaras v. Liquid Carbonic Indus. Corp.*, 74 F.3d 786, 792 (7th Cir. 1996) ("[A] complaint which consists of conclusory allegations unsupported by factual assertions fails even the liberal standard of Rule 12(b)(6).") (citation omitted).

In the Title IX context, deliberate indifference means that a school's response was "clearly unreasonable in light of the known circumstances." *See Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 648 (1999) (stating standard). The Seventh Circuit observes that deliberate indifference is a "high bar," because "[s]chool administrators must continue to enjoy the flexibility they require in disciplinary decisions…." *Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 857 (7th Cir. 2019) (affirming 12(b)(6) dismissal of Title IX claims). Title IX does not require school administrators to engage in any particular disciplinary action. *Davis*, 526 U.S. at 648 (stressing conclusion that courts should refrain second-guessing schools' disciplinary decisions); *see also St. Francis Sch. Dist.*, 694 F.3d at 873 ("Judges must be sensitive to the effects on education of heavy-handed judicial intrusion into school disciplinary issues…."). Moreover, this is an issue that courts can decide as a matter of law on a motion to dismiss. *Davis*, 526 U.S. 648-49 ("In an appropriate case, there is no reason why courts, on a motion to dismiss, for summary judgment, or for a directed verdict, could not identify a response as not 'clearly unreasonable' as a matter of law.").

Here, Plaintiffs do not and cannot allege that the University knew about any misconduct by Schewe before Plaintiffs filed their complaints in August 2018. So there could be no "clearly unreasonable" conduct by the University before August 2018.

10

Plaintiffs allege that *after* they filed their complaints, the University's investigators—Diaz and Truelove—responded right away: they initiated formal investigations into O'Callaghan's and Lorenz's complaints and incorporated Shepp's, Kirkner's, Malone's, and Fry's complaints by interviewing them and crediting them as witnesses in the O'Callaghan and Lorenz investigations. Compl. ¶¶ 85-87, 97-99. The reports that Plaintiffs rely on in the Complaint state that the University's investigators interviewed multiple witnesses, reviewed documents, commissioned a forensic analysis of Schewe's computer, and performed extensive analysis of the facts and the University's Sexual Misconduct Policy. Exs. A, B. Ultimately, investigators determined that there was not a preponderance of evidence to support a conclusion that Schewe violated the University's Sexual Misconduct Policy. *Id.*; Compl. ¶¶ 95-96.

Plaintiffs' factual allegations do not create a plausible inference that the University's response was "clearly unreasonable." *See Columbia Coll. Chicago*, 933 F.3d at 857 (affirming 12(b)(6) dismissal of Title IX claims where university responded quickly to complaint, and plaintiff did not allege that process—as opposed to outcome—was deficient). Plaintiffs identify two problems with the University's investigations:

First, they disagree with the investigations' outcomes. But as a matter of law, it is not enough to allege that the investigators got it wrong. *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994) (deliberate indifference requires something more than negligence); *I.F. v. Lewisville Indep. Sch. Dist.*, 915 F.3d 360, 369 (5th Cir. 2019) (mirroring Seventh Circuit's holdings that deliberate indifference "is an extremely high standard to meet," and holding that erroneous or negligent decisions by officials—or even botched investigations—do not amount to deliberate indifference).

Second, they complain that the University formally investigated only O'Callaghan's and Lorenz's complaints, and that the University relied on the other Plaintiffs only as witnesses.

11

Nowhere, though, do Plaintiffs allege why that was clearly unreasonable. As is clear from the Complaint's allegations, all six Plaintiffs reached out to the University's Office of Access and Equity on the same day, and their allegations overlapped. Compl. ¶¶ 17-87. Investigators Diaz and Truelove interviewed all of the Plaintiffs and relied on their accounts as part of their investigations. *Id.* ¶¶ 87, 97-99. Challenging the manner in which the investigators formally categorized and reviewed students' complaints is precisely the type of second-guessing of school disciplinary processes that the Supreme Court warned against in *Davis*.

Because Plaintiffs fail to allege facts demonstrating that the University actually knew of and was deliberately indifferent to sexual harassment or a hostile environment, Counts 1, 2, and 3 should be dismissed.

**II. Plaintiffs' erroneous-outcome claims do not make sense here, because they were not wrongly disciplined based on sex discrimination**

O'Callaghan and Lorenz style Counts 4 and 5 as "erroneous outcome" claims, in which they allege that the University violated Title IX by reaching the wrong result in its investigations of their complaints. The Complaint alleges that the University "fail[ed] to substantiate [Plaintiffs'] allegations that were supported by a bevy of witnesses" and that the "outcome of the internal investigation…was incorrect given the witness testimony and evidence." Compl. ¶¶ 148-49, 159-60.

The facts Plaintiffs plead—that they think the University got the outcome of the investigations wrong—are not the kinds of facts that support an erroneous-outcome cause of action. Erroneous-outcome claims involve allegations that (1) plaintiff was innocent, (2) plaintiff was wrongly found to have committed an offense, and (3) sex discrimination motivated the erroneous finding. *See, e.g., Doe v. Columbia Coll. Chicago*, 299 F. Supp. 3d 939, 952-57 (N.D. Ill. 2017), *aff'd*, 933 F.3d 849 (7th Cir. 2019) (collecting cases where courts have allowed

12

erroneous-outcome theories and dismissing erroneous-outcome claim under 12(b)(6)); *Doe v. Purdue Univ.*, 928 F.3d 652, 667-68 (7th Cir. 2019) (erroneous-outcome test refers to one way of seeking to show that "sex was a motivating factor in a university's decision to discipline a student").

The erroneous-outcome theory originated in a Second Circuit case, *Yusuf v. Vassar Coll.*, 35 F.3d 709 (2d Cir. 1994). While Yusuf was a student at Vassar College, a female student alleged that Yusuf sexually harassed her. *Id.* at 711. Vassar's disciplinary body found Yusuf guilty and suspended him for one term. *Id.* Yusuf's Title IX claim against Vassar relied upon a theory that Yusuf's gender was a motivating factor in Vassar's erroneous decision to discipline him. *Id.* at 715. The Second Circuit held that such a Title IX claim could proceed if the plaintiff included "a particularized allegation relating to a causal connection between the flawed outcome and gender bias. A plaintiff must thus also allege particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Id.*

Here, the University made no finding that Plaintiffs engaged in any offense. Nor do Plaintiffs plead that sex discrimination motivated the University to discipline Plaintiffs—the University did not discipline Plaintiffs at all. The cause of action simply does not make sense here.

To the extent that Plaintiffs are trying to state a claim based on their belief that the University got the investigations' outcomes wrong, that is not a cause of action either. There is no right to a preferred outcome. *See Dietchweiler by Dietchweiler v. Lucas*, 827 F.3d 622, 630 (7th Cir. 2016) (Due Process Clause does not guarantee that a party's "version of events will be believed"); *Pugel v. Bd. of Trustees of Univ. of Illinois*, 378 F.3d 659, 666 (7th Cir. 2004) ("Due process did not entitle [plaintiff] to a favorable result based on this testimony, only to a meaningful opportunity to present it."). Indeed, the Supreme Court has ruled that school administrators have

13

significant flexibility and that "courts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis*, 526 U.S at 648.

Because there is no erroneous-outcome cause of action on these facts, Counts 4 and 5 should be dismissed.

## CONCLUSION

Defendant requests that this Court grant its motion to dismiss Counts 1 through 5 for failure to state a claim.

Dated: December 2, 2019

Respectfully submitted,
SALVATORE PRESCOTT & PORTER, PLLC

s/ Julie B. Porter
Julie B. Porter (No. 6243787)
Katie Hill (No. 6293005)
Sarah Bakker (No. 6316661)
1010 Davis Street
Evanston, IL 60201
P: (312) 283-5711
F: (312) 724-8353
porter@spplawyers.com
hill@spplawyers.com
bakker@spplawyers.com

*Attorneys for Defendant University of Illinois at Chicago*

14

## CERTIFICATE OF SERVICE

I hereby certify that on December 2, 2019, I electronically filed the foregoing document with the Clerk of the Court using the Court's CM/ECF system, which will send notification of such filing to all counsel of record.

Dated: December 2, 2019  /s/ Julie B. Porter