**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| ERIN O'CALLAGHAN et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 19 C 6271 |
| | ) | |
| THE UNIVERSITY OF ILLINOIS AT CHICAGO, and PAUL SCHEWE, | ) | Judge John J. Tharp, Jr. |
| | ) | |
| Defendants. | ) | |
| | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiffs Erin O'Callaghan, Marlee Fry, Sarah Malone, Veronica Shepp, Anne Kirkner, and Katherine Lorenz are current and former graduate students at the University of Illinois in Chicago (UIC). They assert that Paul Schewe, a former faculty member in the Criminology Department, discriminated against them on the basis of sex in violation of the Fourteenth Amendment by sexually harassing each of them and sexually assaulting O'Callaghan. The plaintiffs also sued UIC, contending that the University violated Title IX by displaying deliberate indifference to Schewe's misconduct and conducting a biased investigation into the same.

Before the Court are UIC's motion for summary judgment and Schewe's motion for partial summary judgment. In its motion, UIC argues that summary judgment is warranted because any reasonable jury would find that it fully complied with Title IX by launching a prompt, fair, and non-discriminatory investigation as soon as it learned about Schewe's alleged misconduct. Schewe, for his part, contends that no reasonable jury would find that he engaged in intentional sex-based discrimination against the plaintiffs or violated the bodily integrity of five of the six plaintiffs. And with respect to O'Callaghan, Schewe maintains that no reasonable jury could find that he acted "under color of state law," an essential element of a Fourteenth Amendment claim.

The Court grants UIC's motion, finding that no UIC official with the capacity to take corrective action knew about Schewe's unlawful conduct before the plaintiffs came forward, that school investigators did not discriminate against the plaintiffs, and that the conclusions of UIC's investigation did not evince bias on the basis of sex. The Court also grants Schewe's motion, finding that the evidence forecloses any conclusion that he engaged in intentional sex-based discrimination or violated the bodily integrity of Fry, Malone, Shepp, Kirkner, or Lorenz—or acted under color of law with respect to O'Callaghan.

## <u>BACKGROUND</u>

On November 2, 2017, a group of UIC graduate students and faculty gathered at a bar in Chicago's West Loop after an afternoon class. *See* Def. Univ. of Ill. Rule 56.1 Statement, Ex. QQ 7, ECF No. 153-43 ("OAE Report"). Several hours later, then–Associate Professor Paul Schewe invited students to continue drinking at his apartment. *Id.* Several joined, including plaintiffs Erin O'Callaghan, Sarah Malone, and Veronica Shepp and non-plaintiff Witnesses 1, 2, and 3.[1] Def. Univ. of Ill. Rule 56.1 Statement, Ex. P 3, ECF No. 153-16 ("Malone Statement"); Def. Univ. of Ill. Rule 56.1 Statement, Ex. Q 3, ECF No. 153-17 ("Shepp Statement"); Def. Univ. of Ill. Rule 56.1 Statement, Ex. L 2, ECF No. 153-12 ("O'Callaghan Statement"); OAE Report 60.

At his apartment, Schewe invited O'Callaghan to the laundry room to look at a casket of homemade wine. OAE Report 7, 13. Schewe claims other students joined, but O'Callaghan insists they were alone. *Id.* O'Callaghan also alleges that Schewe proceeded to "come closer" and "make a move" on her, prompting her to turn away. *Id.* at 7.

---

[1] In keeping with the conventions of UIC's Title IX Report, the Court refers to third-party witnesses anonymously.

Eventually, Schewe and O'Callaghan returned to the living room with the other students. *Id.* at 39, 66. Schewe sat on a small couch; O'Callaghan sat next to him on the couch's arm. *Id.* at 7, 13. O'Callaghan claims that Schewe slipped his hand underneath her shirt and bra and rubbed her bare back without consent in full view of the other students. *Id.* at 8. Schewe denies this, submitting that, at most, he touched O'Callaghan's covered shoulder while resting his arm on the sofa. *Id.* at 13. Different eyewitnesses support each account. *Compare id.* at 53-54, *with id.* at 66, *and id.* at 25, 27.

Around midnight, Shepp, Malone, and Witnesses 1, 2, and 3, left the apartment temporarily to pick up food. Schewe and O'Callaghan stayed behind. *Id.* at 12-13. O'Callaghan later explained that she had fallen asleep on the couch, exhausted and severely intoxicated. *Id.* at 8. Schewe replies that O'Callaghan had remained alert and communicative the entire night and intentionally chose to stay behind. *Id.* at 15. Again, witnesses disagree. Plaintiff Shepp describes O'Callaghan as intoxicated to the point of being "barely audible" when Shepp left the apartment. But Witness 1 maintains that O'Callaghan exhibited normal behavior all night, and Witness 3 claims O'Callaghan was sober, alert, and walking around when the others left. *Compare* Shepp Statement 3, *with* OAE Report 60-61, 66.

Schewe provides the following description of what happened next: After the others left, Schewe retired alone to his bedroom and lay on his bed. OAE Report 13, 15. (Based on later testimony, it appears Schewe also took off his pants but kept his boxer briefs on. *Id.* at 28, 59.) Moments later, O'Callaghan entered, removed her pants, and climbed into bed next to him. *Id.* at 13. The two lay side by side, talking but not engaging in intimate contact. *Id.*

O'Callaghan presents a different account: As her classmates were leaving, O'Callaghan fell asleep on the couch. The next thing she remembers, she awoke alone in Schewe's bedroom,

lying sideways on the bed. Schewe entered, laughing menacingly. *Id.* Schewe rolled O'Callaghan over and removed her pants. *Id.* Terrified, O'Callaghan froze and pretended to be asleep. *Id.* Schewe then began to perform oral sex on O'Callaghan while she blacked out. *Id.*

Meanwhile, Witness 1 drove the rest of the group to a nearby service station and fast-food restaurant. *Id.* at 54. Shepp then called a rideshare home, and the rest returned to Schewe's apartment. They were gone for approximately 15 minutes.[2]

Back at Schewe's apartment, Witness 1 recalls that the lights were off and the door was locked. *Id.* at 59. Schewe greeted the group in boxer shorts. *Id.* at 28, 59. Once inside, Malone noticed that O'Callaghan was no longer in the living room. *Id.* at 28. She also claims that Schewe had placed a loud radio outside his bedroom, which she interpreted as an attempt to mask any noise from inside. *Id.* Malone demanded to know where O'Callaghan was. *Id.* at 55. Witness 1 told Schewe he needed to "go and get her [O'Callaghan] and bring her back here." *Id.*[3] Schewe did not respond. According to Witness 1, he "just kind of smirked," went back to the bedroom, and did not return. *Id.* Witness 1, Witness 3, and Malone then left Schewe's apartment.

Witness 2 stayed behind. Extremely intoxicated, he "pretty much passed out" on Schewe's couch and remained there all night. *Id.* at 28, 54, 60. Before falling asleep, Witness 2 claims he saw O'Callaghan and Schewe leave the living room, tell him goodnight, walk down the hall while chatting, and enter Schewe's bedroom together. *Id.*

---

[2] Although Schewe claims the group was gone for 30-45 minutes, OAE Report 13, his testimony is an outlier. Witness 1, the only attendee who remained sober, recalls being gone for 7-10 minutes. *Id.* at 54. Malone approximates 10-15 minutes, *id.* at 25, 28, and Shepp estimates no more than 10 minutes, *id.* at 46-47.

[3] There is some confusion on this point. Witness 3 claims Witness 2 was arguing with Malone and insisting that O'Callaghan was fine. OAE Report 66. And Schewe states that he understood Witness 2 to be encouraging him to return to be with O'Callaghan in his bedroom. Witness 2 denies both assertions.

On her way home, Malone worried that something might have happened to O'Callaghan. At 12:53 a.m., she texted O'Callaghan to ask if she was okay. Def. Univ. of Ill. Rule 56.1 Statement, Ex. E 87:5-20, ECF No. 153-5 ("Malone Dep."). O'Callaghan replied: "I'm okay. Are you okay?" *Id.* at 88:8-9. Malone answered that she had gotten home safely. OAE Report 40. Malone then asked O'Callaghan if O'Callaghan had fallen asleep while they went to the store, and O'Callaghan said yes. *Id.*

Over the next week or so, O'Callaghan shared her experience on November 2 with Malone and Shepp; several months later, she shared with other co-plaintiffs. But she did not initially report Schewe, explaining that she feared reprisal. *Id.* at 9-10. As the director of graduate studies and the head of several research grants (including one that employed O'Callaghan as a research assistant), Schewe wielded significant authority. O'Callaghan feared that, if she came forward, Schewe might retaliate by terminating her employment or withholding research opportunities.

In July 2018, Plaintiffs Katherine Lorenz and Anne Kirkner reached out to Dr. Beth Richie, dean of the Criminology Department, to learn more about the University's Title IX reporting process. Pls.' Rule 56.1(b)(2) Resp. to Def. Bd. of Trustees to the University of Ill.'s Statement of Facts 20 ¶ 37, ECF No. 164 ("UIC 56.1 Statement"). During their conversation, Lorenz and Kirkner described, in general terms, incidents when they had felt harassed or uncomfortable because of Schewe. But they did not share any behavior that had targeted others, including O'Callaghan. *Id.* at 20-22 ¶¶ 37, 39. Dr. Richie encouraged Lorenz and Kirkner to file reports and introduced them to UIC's Office for Access and Equity (OAE), Title IX coordinator, and associate chancellor. *Id.* at 21 ¶ 38, 39 ¶ 75. Those officials also followed up to offer further assistance. *Id.* at 21 ¶ 38.

5

On August 12, 2018, the plaintiffs filed six Title IX reports against Schewe. *Id.* at 23 ¶ 41. O'Callaghan's report centered around the events of November 2, 2017, which she described in detail. *See generally* O'Callaghan Statement. Malone and Shepp also shared their recollections from that night. In addition, Malone reported another incident when Schewe had invited her to his boat party, introduced her as one of his graduate students, and added, "I only fuck my students after they've defended [their dissertations]." Malone Statement 2. Shepp recalled another uncomfortable moment when a group of students were discussing R. Kelly's history of sexual violence against women and Schewe interjected that he would still want to party with the celebrity. Shepp Statement 3.

Marlee Fry reported two other incidents. One day, Schewe spontaneously decided to relocate a class session to his boat. He then proceeded to ignore course materials, discuss his personal life instead, and emphasize how much he wished the students could drink. *Id.* at 2. At another boat party, Schewe commented on Fry's appearance, shared that he planned to spend the night onboard to avoid his wife, and failed to intervene when two of his male friends laughingly tried to slip a finger through a hole in Fry's jeans. *See* Def. Univ. of Ill. Rule 56.1 Statement, Ex. M 2, ECF No. 153-13 ("Fry Statement").

Kirkner and Lorenz reported misconduct as well. Both asserted that Schewe had pressured them to drink onboard his boat and had alluded to having drugs onboard. *See* Def. Univ. of Ill. Rule 56.1 Statement, Ex. N 2, ECF No. 153-14 ("Kirkner Statement"); Def. Univ. of Ill. Rule 56.1 Statement 2, Ex. O, ECF No. 153-15 ("Lorenz Statement"). Lorenz also recalled an advising meeting during which she saw images of a naked woman on Schewe's work computer and a dissertation party where Schewe had told her partner "there are so many women here I want to fuck." Def. Univ. of Ill. Rule 56.1 Statement, Ex. GG 3, ECF No. 153-33 ("Lorenz Findings

Letter"). She also recalled how Schewe had once texted her an unsolicited photo of two woman in g-strings on his boat from the rear, quickly apologizing and explaining that he had sent it accidentally. Lorenz Statement 2.

On August 13, 2018—the day after the plaintiffs filed their reports—UIC placed Schewe on immediate administrative leave, barring him from entering campus, teaching, or otherwise interacting with students. UIC 56.1 Statement 25 ¶ 45. Upon review of the plaintiffs' Title IX reports, OAE officials determined that four—O'Callaghan, Lorenz, Fry, and Malone—had alleged serious violations of UIC's Sexual Misconduct Policy that merited further investigation. UIC 56.1 Statement 27 ¶ 50. Of these four, two decided to proceed with the investigation: O'Callaghan and Lorenz. *Id.* at 27 ¶¶ 50-51.

Over the next eight months, OAE reviewed documents and statements submitted by both sides, made follow-up inquiries, and interviewed or took statements from over 18 witnesses. UIC 56.1 Statement 30 ¶ 56.

On April 26, 2019, OAE released its official findings. The office determined that it was unable to substantiate any alleged violation of UIC's Sexual Misconduct Policy by a preponderance of the evidence. *See* Def. Univ. of Ill. Rule 56.1 Statement, Ex. FF, ECF No. 153-32 ("O'Callaghan Findings Letter"); Lorenz Findings Letter. Although OAE found that the evidence supported many of the allegations made by Lorenz, it determined that those allegations did not rise to the level of "sexual misconduct" as defined by university policy. *See* Lorenz Findings Letter 2-3. Conversely, the Office found that O'Callaghan's allegations undoubtedly qualified as sexual misconduct but could not be substantiated by a preponderance of the evidence. O'Callaghan Findings Letter 3-6.

After issuing its report, OAE referred its investigation to the Dean of the University to determine whether Schewe's behavior warranted any follow-up inquiries. In its referral letter, OAE listed actions taken by Schewe that, while not technically sexual misconduct, might have breached other standards of professional conduct. The list included: storing inappropriate photos on a University-owned computer, inviting students to party on his boat, sending an inappropriate image to a female student, and serving alcohol to, sharing a bed with, cuddling, and rubbing the back of a female student. Def. Univ. of Ill. Rule 56.1 Statement, Ex. II, ECF No. 153-35.

UIC administrators then hired outside counsel to conduct an independent investigation into Schewe's misconduct. UIC 56.1 Statement 37 ¶ 71. The investigation found multiple violations of UIC's codes of conduct, leading the Board of Trustees to revoke Schewe's tenure and terminate his employment on March 17, 2022.

Meanwhile, the plaintiffs took matters into their own hands, filing this lawsuit against Schewe and UIC in federal court. The plaintiffs alleged that the University violated Title IX, which generally prohibits schools from engaging in sex-based discrimination, in two ways: First, the plaintiffs asserted that UIC had directly discriminated against them during its internal investigation into Schewe's misconduct. Second, the plaintiffs claimed that the school had violated Title IX indirectly by displaying deliberate indifference to Schewe's misconduct despite being fully aware of its prevalence.

The plaintiffs also brought claims against Schewe directly under 42 U.S.C. § 1983, alleging violations of the Fourteenth Amendment to the U.S. Constitution. Specifically, the plaintiffs claimed that Schewe violated the Equal Protection Clause by engaging in sex-based discrimination

in his official capacity as a state employee and violated the Due Process clause by infringing on their bodily integrity.[4]

UIC moved to dismiss for failure to state a claim. The Court granted the motion as to Lorenz's discriminatory-investigation claim, reasoning that Lorenz could not have suffered discrimination "under an education program" because she had already graduated before the investigation began. *See* Order & Statement 6-7, ECF No. 58. The Court denied UIC's motion on all other counts, finding that the plaintiffs had adequately alleged both actual knowledge and discrimination on the part of the University. *Id.* at 3-7.

Following discovery, UIC sought summary judgment on the two counts against it. The University asserted that no reasonable jury would find that its Title IX investigation was discriminatory, or that it was deliberately indifferent to Schewe's misconduct. Schewe moved for partial summary judgment on the plaintiff's constitutional claims, contending that he did not commit misconduct against O'Callaghan under color of law and never engaged in sex-based discrimination or violated the bodily integrity of the other five plaintiffs.

## DISCUSSION

When reviewing a motion for summary judgment, the Court construes the evidence in the light most favorable to the non-moving party and draws all reasonable inferences in their favor. *Bartman v. Allis Chalmer Corp.*, 799 F.2d 311, 312 (7th Cir. 1986). Summary judgment is warranted when the record, so construed, reveals no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact

---

[4] The plaintiffs initially named two other University administrators as defendants but later voluntarily dismissed them.

exists when the record contains "evidence on which the jury could reasonably find" in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).[5]

## I.  The plaintiffs' Title IX Claims Against UIC

### A.  Direct Discrimination

Title IX provides that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a); *see also Cannon v. Univ. of Chicago*, 441 U.S. 677, 717 (1979) (establishing that Title IX creates an implied cause of action against federally funded education providers). A school engages in prohibited discrimination when it deliberately subjects someone to unequal treatment because of their sex. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005) (noting that "[d]iscrimination" refers to "a wide range of intentional unequal treatment").[6]

---

[5] In their response to Schewe's motion for partial summary judgment, the plaintiffs assert that "summary judgment should be granted only when the movant is entitled to judgment beyond all doubt." Memo. in Opp. to Partial Summ. J. 2, ECF No. 166. That is not the standard. Rather, the movant must demonstrate that no reasonable jury could find in favor of the nonmovant by the applicable burden of proof at trial—in this civil case, by a preponderance of the evidence. *See Roberts v. Samardvich*, 909 F. Supp. 594, 601 (N.D. Ind. 1995) ("The inquiry involved in ruling on the motion for summary judgment implicates the substantive evidentiary standard of proof, for example, preponderance of the evidence, that would apply at trial.").

[6] UIC asserts that, in addition to showing intentional sex-based discrimination, a Title IX plaintiff must demonstrate that they were excluded from or denied the benefits of an educational program. That position ignores the final clause of 20 U.S.C. § 1681(a), which guarantees that no person shall "be excluded from participation in, be denied the benefits of, *or be subjected to discrimination* under any education program or activity" (emphasis added) on the basis of sex. *See Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 641 (1999) (noting that, to violate Title IX, a recipient of federal funds must "exclude persons from participation in, deny persons the benefits of, *or subject persons to discrimination* under its programs" (cleaned up) (emphasis added)).

True, the Seventh Circuit has occasionally referred to the Title IX standard by shorthand. *See Doe v. Columbia Coll. Chicago*, 933 F.3d 849, 854 (7th Cir. 2019) (stating that establishing a Title IX violation requires showing that the plaintiff was "excluded from participation in or denied the benefits of an educational program"). But the Court does not read Seventh Circuit case law for

The Court agrees with UIC that the evidentiary record dispels any notion that University investigators discriminated on the basis of sex. OAE, the office tasked with the school's internal investigation, afforded the plaintiffs a wide range of procedural privileges. The Office permitted—indeed encouraged—O'Callaghan and Lorenz to submit unlimited evidence, testify repeatedly, provide witnesses, review materials from the opposing side, directly comment on OAE's preliminary findings, and deliver, review, and amend their statements. UIC 56.1 Statement 29 ¶ 54. Such privileges strongly distinguish the UIC investigation from those which courts have found discriminatory. In *Doe v. Purdue University*, for instance, the Seventh Circuit found that a student had plausibly pleaded discrimination on the part of a university that had found the student guilty of sexual assault without hearing directly from the victim, sharing its report with the student, attempting to corroborate the student's false confession, or permitting the student to present witnesses. 928 F.3d 652, 657, 669 (7th Cir. 2019). The contrast with this case could hardly be starker.

OAE also assigned the plaintiffs' testimony substantive weight—at least as much as that given to male witnesses. Schools risk violating Title IX when they "credit[] exclusively female

---

the proposition that a Title IX claimant must necessarily show that they were excluded from or denied the benefits of an educational program. Two of the cases that UIC cites for that proposition involved claimants who had in fact been suspended. *See, e.g.*, *id.* at 857; *Doe v. Purdue Univ.*, 928 F.3d 652, 662 (7th Cir. 2019). In that context, the Seventh Circuit noted that exclusion or denial of educational benefits on the basis of sex was a *sufficient* factor to make out a Title IX claim. *Columbia Coll.*, 933 F.3d at 854; *Purdue*, 928 F.3d at 662. But our Court of Appeals has never held that a showing of exclusion or denial of educational benefits is a *necessary* factor under Title IX. In *Gabrielle M. v. Park Forest-Chicago Heights, Illinois School District 163*—another case cited by UIC—the Seventh Circuit emphasized that that student-on-student harassment must have a "concrete, negative effect" on a victim's education access for a school's deliberate indifference to such harassment to violate Title IX. 315 F.3d 817, 821 (7th Cir. 2003). But neither *Gabrielle M.* nor any subsequent case has suggested that even direct, intentional discrimination by a public school is insufficient absent proof of a resulting denial of education benefits. The Court thus rejects UIC's argument that O'Callaghan and Lorenz's successful completion of their degrees defeats their claim.

testimony" while "reject[ing] all of the male testimony," or vice versa. *See Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018); *see also Purdue*, 928 F.3d at 669. Here, by contrast, OAE considered all witnesses' statements and testimony regardless of sex. *See* UIC 56.1 Statement 36 ¶ 69 (noting that OAE credited, and occasionally discredited, accounts from both female and male witnesses in its final report).

Because the plaintiffs have not adduced any evidence that OAE denied the plaintiffs procedural privileges afforded only—or disproportionately—to a male party, there is no basis for a finding of unequal treatment by OAE. *See Jackson*, 544 U.S. at 175 (noting that discrimination refers to "intentional *unequal* treatment" (emphasis added)). Even if OAE had treated the plaintiffs unequally, however, their Title IX claim would still fail. A Title IX claimant must do more than show disparate treatment; they must establish that they were intentionally treated less fairly because of their sex. *Doe v. Univ. of S. Indiana*, 43 F.4th 784, 793 (7th Cir. 2022) (holding that, to make out a Title IX claim, a plaintiff must establish that "the defendant deviated from proper procedures not because of human error but by design, to achieve covertly what it could not do openly: discriminate against the plaintiff on the basis of [] sex").

The Court finds no evidence—direct or circumstantial—that OAE investigators harbored prejudice against women, much less that they intentionally acted upon such prejudice during their investigation. The plaintiffs assert that investigators showed sex-based bias by asking O'Callaghan how much she had to drink on November 2, 2017. But that question alone is not indicative of sex-based bias. OAE asked many witnesses how much they drank on November 2, including both Schewe and male third parties. In its report, the Office mentioned witnesses' intoxication levels strictly to assess their credibility, not to impute blame. *See generally*, *e.g.*, O'Callaghan Findings Letter. That is perfectly valid. This Court has repeatedly emphasized that a witness' intoxication

12

level informs their credibility and perception. *See*, *e.g.*, *Casares v. Bernal*, 790 F. Supp. 2d 769, 785-86 (N.D. Ill. 2011) ("Where there is reason to believe that alcohol or marijuana had seriously impaired a witness's memory of the events to which he is testifying or prevented him from understanding the events at the time they occurred, evidence of his drug or alcohol use is admissible."); *Taylor v. Denny's Inc.*, 2005 WL 8179227, at *1 (N.D. Ill. May 24, 2005) (noting that evidence of alcohol consumption was relevant to "the credibility of [a witness's] recollection of . . . events"). Investigators confronted with competing witnesses are free to consider sobriety as an important factor in assessing their respective accounts. Indeed, to neglect to do so may well compromise the validity of their findings and spark accusations of bias.

The plaintiffs also fault OAE for asking O'Callaghan what she wore on November 2. Without a valid nondiscriminatory purpose, such a question may well provide evidence of sex discrimination, given society's problematic tendency to assign blame to, or assume the consent of, female sexual-assault survivors based on how they dressed. In this case, however, OAE had a compelling reason for such inquiry. Trying to disprove O'Callaghan's allegations, Schewe had told OAE that he could not have removed O'Callaghan's pants on November 2 because she had worn tight skinny jeans. By asking O'Callaghan about this detail, OAE was simply completing its due diligence on an issue that bore directly upon the plausibility of Schewe's account. The alternative course of action—accepting Schewe's defense at face value while denying O'Callaghan an opportunity to impeach—would have been far less fair to the plaintiffs. Given the legitimate investigatory purpose behind OAE's question and the total lack of evidence of a discriminatory motive, any suggestion of prejudice amounts to little more than weightless speculation. *See MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 994 F.3d 869, 876 (7th Cir. 2021) (inferences that are merely "conceivable" do not create a genuine dispute of material fact).

13

The plaintiffs press one final argument. Regardless of how OAE conducted its investigation, the plaintiffs insist that the Office's final conclusions indicate that it was motivated by sex-based bias. Given the gravity, pervasiveness, and evidence of Schewe's offenses, OAE's conclusion that it could not substantiate a single violation of UIC's Sexual Misconduct Policy strongly suggests that investigators were biased against them as women, according to the plaintiffs.

"[C]ourts do not quickly infer that an erroneous result [of a Title IX investigation] must have been caused by unlawful bias." *See Univ. of S. Indiana*, 43 F.4th at 799. To prove sex discrimination solely on the basis of an investigation's outcome, the plaintiffs must do more than show that the outcome was erroneous. *Id.*; *see also Hendrichsen v. Ball State Univ.*, 107 F. App'x 680, 683-85 (7th Cir. 2004). They must establish that the findings were "sufficiently lopsided" to "support an inference" of intentional discrimination on the basis of sex. *See Univ. of S. Indiana*, 43 F.4th at 799; *see also Doe v. Columbia Univ.*, 831 F.3d 46, 57 (2d Cir. 2016) ("When the evidence substantially favors one party's version of a disputed matter, but an evaluator forms a conclusion in favor of the other side (without an apparent reason based in the evidence), it is plausible to infer . . . that the evaluator has been influenced by bias.").

OAE's finding that Lorenz did not allege a violation of the university's Sexual Misconduct Policy was not "sufficiently lopsided" to support an inference of intentional sex discrimination. To commit sexual harassment under UIC policy, a party must (1) implicitly or explicitly make submission to sexual conduct a term or condition of a person's education, living environment, employment, or participation in a University-related program; (2) base decisions affecting a person's education, living environment, employment, or participation in a University-related program on their submission to sexual conduct; or (3) engage in sexual conduct that "has the purpose or effect of unreasonably interfering with an individual's work or academic performance

or creating an intimidating, hostile, or offensive environment for working, learning, or living on campus." Lorenz Findings Letter 4. Lorenz claimed that Schewe (1) texted her a photo of scantily clad women before later apologizing and explaining that it was an accident, (2) inadvertently left images of a naked woman open on his work computer during an advising meeting, (3) commented about avoiding his wife on his boat, (4) pressured her to drink, (5) alluded to drugs, and (6) told her partner "there are so many women here I want to fuck" at her dissertation party. *Id.* at 2-3. While certainly inappropriate, this conduct did not squarely fall within UIC's Sexual Misconduct Policy. Lorenz never alleged that Schewe made her submission to sexual conduct a "term or condition" of an educational benefit or the basis for decisions regarding her education. And the evidence supports the conclusion that Schewe's actions toward Lorenz did not "interfer[e]" with her academic performance or create an "intimidating, hostile, or offensive environment" for her on campus. Indeed, Lorenz did not allege any impact on her education, she was able to secure a position as a research assistant during every semester she desired one, and she successfully graduated with her Ph.D. in 2017. UIC 56.1 Statement 40 ¶ 78; Lorenz Statement 2. Moreover, evidence suggests that at least some of Schewe's misconduct did not result in immediate tangible harm. After Schewe texted inappropriate images, for instance, Lorenz replied: "Lol sorry I'm missing out on what looks to be such a good time!" Pls.' Local R. 56.1(b)(2) Resp. to Def. Paul Schewe's Statement of Facts 14 ¶ 27, ECF No. 167 ("Schewe 56.1 Statement").

OAE's conclusion that it could not substantiate O'Callaghan's core allegations by a preponderance of the evidence does not support an inference of sex discrimination either. In cases where the outcome of a Title IX investigation is so decoupled from evidentiary reality as to only make sense as the product of unlawful sex discrimination, the outcome alone may well be sufficient to create a genuine dispute of material fact. But this is not that case. OAE treated O'Callaghan's

accusations with the seriousness they deserved, outlining its reasoning in detail, substantiating key findings with citations to the record, and providing persuasive and non-pretextual reasons behind each decision to assign less weight to certain aspects of a witness' testimony. Investigators emphasized, for example, inconsistencies in O'Callaghan's testimony, the lack of eyewitness testimony at key points, some witnesses' inability to recall details due to intoxication, the starkly conflicting accounts provided by Schewe and O'Callaghan, text messages from O'Callaghan that contradicted her claim that she was incapacitated after her friends left Schewe's apartment, and one witness' implausible claim that she could not produce text messages because she accidentally broke her phone days after first acknowledging her possession of them. O'Callaghan Findings Letter 3, 4 & n.2, 5 & n.4, 6, 9; UIC 56.1 Statement 31 ¶ 58. In light of these reasons, and the total lack of direct or circumstantial evidence of a discriminatory motive, no reasonable jury could draw an inference of deliberate bias against women from OAE's conclusions alone

Even if the outcome of the OAE investigation had been sufficiently unjustifiable to support an inference of discrimination, any such inference would be decisively rebutted by the University's conduct immediately before the investigation. OAE officials placed Schewe on indefinite administrative leave and launched a full investigation less than 24 hours after receiving the plaintiffs' reports. The promptness and thoroughness of this response powerfully undercuts any implication of bias that might be drawn from their ultimate conclusions.

UIC's actions after issuing the OAE report also speak volumes. Rather than exonerate Schewe, as might be anticipated if they harbored sex-based bias against the plaintiffs, university administrators referred the case to outside counsel. During the independent investigation that followed, the school extended Schewe's leave, continuing to bar him from campus. When that investigation implicated Schewe, UIC promptly initiated disciplinary proceedings, completed the

16

complex process of revoking tenure, and permanently terminated Schewe's employment. These decisive actions demonstrated the University's commitment to the plaintiffs' wellbeing, shielded the plaintiffs from having to interact with Schewe, and—most saliently for purposes of the instant motion—rebut any notion that university officials harbored sex-based prejudice.

### B. Deliberate Indifference

Generally speaking, liability under Title IX extends only to discriminatory actions taken by a federally funded education provider. *See Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 640-41 (1999) (clarifying that Title IX does not subject schools to general *respondeat superior* liability for employees' misconduct). That said, a school can violate Title IX by displaying "deliberate indifference" to intentional sex discrimination by an employee. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 288-89, 290 (1998). To prevail on a deliberate-indifference theory, a plaintiff must show that a school official "with authority to take corrective action to end the discrimination" had "*actual knowledge* of discrimination" but nonetheless displayed "'deliberate indifference to discrimination' reflecting 'an official decision by the recipient [entity] not to remedy the violation.'" *C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 541 (7th Cir. 2022) (quoting *Gebser*, 524 U.S. at 290-91).

The plaintiffs maintain that UIC violated Title IX by displaying deliberate indifference to Schewe's misconduct. UIC responds that no reasonable jury could find that a UIC official with the authority to take corrective action knew that Schewe had engaged in intentional sex discrimination before the plaintiffs filed their Title IX reports. UIC is correct.

The record does not permit a finding of deliberate indifference. None of UIC's chancellors, provosts, or deans were aware of Schewe's problematic behavior before August 12, 2018 (the day the plaintiffs filed their Title IX complaints). UIC 56.1 Statement 12 ¶ 20. As soon as they became

17

aware, UIC's Title IX coordinator discussed the allegations with the associate chancellor, agreed that "immediate action was necessary," placed Schewe on immediate leave, and initiated an investigation. *Id.* at 24-25 ¶¶ 43, 45-47. These actions refute any inference that UIC was deliberately indifferent.

The plaintiffs ask the Court to attribute knowledge of Schewe's misdeeds to UIC one month earlier. According to the plaintiffs, Lorenz and Kirkner put the University on notice in July 2018 when they reached out to Dr. Beth Richie to discuss filing a report. The plaintiffs assert that Dr. Richie's failure to take immediate corrective action at that time amounted to deliberate indifference.[7]

Contrary to the plaintiffs' argument, Kirkner and Lorenz's conversation with Dr. Richie did not put UIC on notice. Awareness of an employee's mere disciplinary infractions or inappropriate behavior does not open the door to deliberate indifference. To violate Title IX, a university must harbor knowledge of employee misconduct that rises to the level of intentional sex discrimination. *See Madison Metro. Sch. Dist.*, 34 F.4th at 542. Teacher-on-student sexual harassment qualifies as intentional sex discrimination only when it is "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* (quoting *Davis*, 526 U.S. at 650); *see also*

---

[7] In their amended complaint, the plaintiffs claimed that two other university employees, Dr. Sarah Ullman and Daniella Smith, were also aware of Schewe's misconduct. Plaintiffs have since abandoned that contention, however, failing to mention either employee in their response to UIC's motion for summary judgment. Accordingly, Plaintiffs have waived any argument that either Ullman's or Smith's interactions with Schewe put UIC on notice for purposes of Title IX liability. *See Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment."). In any case, neither Ullman, Schewe's peer, nor Smith, an administrative assistant, possessed the authority to "institute corrective measures on the [school's] behalf." *Gebser*, 524 U.S. at 290. As such, any knowledge of Schewe's misconduct that either may have had cannot be imputed to UIC.

*Jackson*, 544 U.S. at 174 (holding that sexual harassment qualifies as a form of prohibited sex discrimination under Title IX). So, for Dr. Richie's knowledge to provide the basis for a finding of deliberate indifference, Kirkner and Lorenz must have reported acts of "severe, pervasive, and objectively offensive" sexual harassment that "deprive[d] [Schewe's] victims of access to [] educational opportunities or benefits." *Madison Metro. Sch. Dist.*, 34 F.4th at 542 (quotation marks omitted).

During their conversation with Dr. Richie, Lorenz and Kirkner did not share incidents of sexual harassment that were sufficiently severe and harmful to amount to intentional sex discrimination. The two plaintiffs never informed Dr. Richie about the events of November 2.[8] Nor did they allege, except in the vaguest terms, that Schewe had committed sexual assault. *See* Def. Univ. of Ill. Rule 56.1 Statement, Ex. C 112:21-24, ECF No. 153-3 (plaintiffs stated that Schewe had "really, really harmed someone" without any further elaboration). In fact, Kirkner did not remember whether they specified that the harm was sexual in nature and could not recall using Schewe's name. *Id.* at 56:7-13, 112:21-24.

Far from delving into details, Kirkner and Lorenz were "very careful about what information [they] shared" with Dr. Richie because they knew that, as a department head, Dr. Richie would be obligated to report any potential Title IX violations to OAE. *Id.* at 51:13-52:2. Preferring to keep their allegations private for the time being, Kirkner and Lorenz deliberately avoided offering specifics. As Kirkner explained, "we were saying that he had engaged in some inappropriate behavior, but because we didn't want to trigger our report specifically at that time we were, you know, sort of holding back information." *Id.* at 55:15-20. According to Kirkner, the

---

[8] Whether O'Callaghan's sexual assault allegation constitutes an act of sex discrimination is immaterial to the Court's analysis. Assuming (again without deciding) that it does, Dr. Richie did not hear about that incident until after Plaintiffs filed their OAE complaints.

meeting "was more . . . for our own information gathering purposes. And I think that it was less about informing her." *Id.* at 58:12-20.

Given the plaintiffs' objective—to learn about the Title IX grievance process without divulging any tangible information—it is unsurprising that Dr. Richie came away from the conversation without any notice that Schewe had engaged in sex-based discrimination. "School administrators have actual knowledge only of the incidents that they witness or that have been reported to them." *Doe v. Galster*, 768 F.3d 611, 618 (7th Cir. 2014). And vague references to misconduct are insufficient to provide the "actual notice" that *Gebser* requires. *See Gabrielle M. v. Park Forest-Chi. Heights, Ill. Sch. Dist. 163*, 315 F.3d 817, 822 (7th Cir. 2003) (finding a plaintiff's allegations of conduct "so vague and unspecific" that they could not "provide a basis to determine whether [the] conduct" qualified as sex discrimination such that the school was put on notice).

The plaintiffs stress that, although Lorenz and Kirkner did not relate the sexual-assault allegation to Dr. Richie, they did describe multiple other instances of sexual harassment. Those instances alone, however, do not rise to the level of intentional sex-based discrimination. Two examples Lorenz related—Schewe offering alcohol on his boat and alluding to avoiding his wife—do not qualify as sexual harassment at all, much less "severe" or "objectively offensive" sexual harassment. Other examples—Schewe telling Lorenz's partner that he desired sexual relations with women at her dissertation-defense party and possessing a photo of a naked woman on his computer screen—did not "deprive[]" Lorenz of educational opportunities. Another act of misconduct that Lorenz related—Schewe texting a picture of scantily clad women—appears to have been accidental and quickly forgiven. *See* Schewe 56.1 Statement 14 ¶ 27. While undoubtedly inappropriate, this exchange, like Lorenz's other examples of questionable behavior, does not rise

20

to the level of "severe, pervasive, and objectively offensive" sexual harassment prohibited by Title IX. *See Madison Metro. Sch. Dist.*, 34 F.4th at 542 (quotation marks omitted).

Because Lorenz and Kirkner successfully kept Dr. Richie in the dark regarding the severity of Schewe's alleged misconduct, their conversation in July 2018 did not provide UIC with "actual knowledge" that Schewe had engaged in intentional discrimination on the basis of sex. *See id.* at 540. Even if it had, however, UIC would not be liable under Title IX because Dr. Richie did not display deliberate indifference following her conversation with the plaintiffs.

"Deliberate indifference" refers to conduct that is "so unreasonable, under all the circumstances, as to constitute an 'official decision' to permit discrimination." *Id.* at 543 (quoting *Gebser*, 524 U.S. at 290). Dr. Richie showed nothing of the sort. The professor expressed support for Lorenz and Kirkner during their conversation and encouraged them to file reports. UIC 56.1 Statement 21 ¶ 38. She later followed up to introduce the students to the Title IX coordinator and associate chancellor. And, as the head of the Criminology Department, Dr. Richie made sure that any student who had previously arranged to receive funding through Schewe's research project in Fall 2018 continued to receive funding despite Schewe's administrative leave. *Id.* at 39 ¶ 76. Throughout, Dr. Richie's conduct reflected a firm commitment to investigating the plaintiffs' allegations and taking appropriate corrective action, not deliberate indifference to discrimination.

The plaintiffs fault Dr. Richie for a letter she sent Schewe on August 2, 2018. According to the plaintiffs, the letter encouraged Schewe to apply for a promotion, thereby revealing deliberate indifference to the allegations confided only a few weeks prior.

The plaintiffs' characterization of the August 2 letter as an "encouragement" to apply for a promotion is off the mark. The purpose of Dr. Richie's letter—explicitly stated in the first sentence—was "to provide feedback on [Schewe's] contributions" to the department. *See* Pls.'

Rule 56.1(b)(2) Resp. to Def. Bd. of Trustees to the Univ. of Ill.'s Statement of Facts, Ex. 8, at 1, ECF No. 164-8 ("Dr. Richie Letter"). Some of Dr. Richie's feedback, to be sure, was positive. *See id.* (stating that Dr. Richie had "made important recent contributions to the field," published "noteworthy" pieces, and demonstrated "commend[able]" initiative, a "solid" teaching record, and "strong instructional skills"). But other feedback ranged from constructive to critical. *See id.* ("encourag[ing]" Schewe to obtain an annual peer evaluation, expressing "hope" that Schewe provided professional support to students "more widely in the department," and suggesting that Schewe "expand [his] focus from those students whose work is closely aligned with [his own] to include others"). And Dr. Richie's ultimate recommendation, contrary to the plaintiffs' assertion, was neutral and diplomatic: "Since you are putting together your packet for Promotion to Full Professor I expect that we will have several other opportunities to discuss your future work. I look forward to hearing about your next projects, your contributions to the curriculum and your continued service to the department." *Id.* If anything, Dr. Richie simply acknowledged the fact that Schewe had already decided to apply for promotion and invited further dialogue. Such a missive, which was part of Dr. Richie's normal duties as department head, does not suggest deliberate indifference.

Dr. Richie did not receive any allegations of sexual harassment by Schewe that were sufficiently severe, pervasive, and harmful to constitute intentional sex discrimination. And even if she had, her actions following her conversation with Lorenz and Kirkner belie any notion of deliberate indifference. For these reasons, the Court finds that no jury could reasonably find UIC liable for deliberate indifference under Title IX.[9]

---

[9] The parties dispute whether Dr. Richie possessed the authority to take corrective action. UIC emphasizes that Dr. Richie lacked the authority to hire and fire faculty or revoke tenure. *See* UIC 56.1 Statement 19 ¶ 36. Plaintiffs counter that, as the head of Schewe's department, Dr. Richie

## II.     The Plaintiffs' Constitutional Claims Against Schewe

In addition to their Title IX allegations against UIC, the plaintiffs assert constitutional claims against Schewe directly under 42 U.S.C. § 1983. Section 1983 authorizes lawsuits by those "deprived of a right secured by the Constitution or federal law, by a person acting under color of law." *Thurman v. Village of Homewood*, 446 F.3d 682, 687 (7th Cir. 2006). An "[a]ction is taken under color of state law when it involves a misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Honaker v. Smith*, 256 F.3d 477, 484 (7th Cir. 2001) (quotation marks omitted); *see also Barnes v. City of Centralia*, 943 F.3d 826, 831 (7th Cir. 2019); *West v. Atkins*, 487 U.S. 42, 49 (1988). The plaintiffs claim that Schewe infringed two "right[s] secured by the Constitution" while acting under the color of law: the rights to equal protection and due process enshrined in the Fourteenth Amendment. *See Thurman*, 446 F.3d at 687.

The Equal Protection Clause prohibits state actors from intentionally discriminating on the basis of certain protected characteristics, including sex. *United States v. Virginia*, 518 U.S. 515, 533 (1996). Its protections extend to the victims of intentional sexual harassment that is sufficiently severe or pervasive so as "to have altered the conditions of [the victim's] employment such that it created an abusive working environment." *Passananti v. Cook County*, 689 F.3d 655, 667 (7th Cir. 2012); *see also Huff v. Sheahan*, 493 F.3d 893, 902 (7th Cir. 2007). Factors in determining whether a working environment is hostile "include the severity of the allegedly discriminatory conduct, its

---

signed the letter placing him on administration leave. Ultimately, this debate does not matter. The Court assumes without deciding that Dr. Richie possessed the sufficient disciplinary authority such that any actual knowledge that she might have had could be imputed to UIC. As explained above, the record reflects that Richie lacked such knowledge.

frequency, whether it was physically threatening or humiliating or merely offensive, and whether it unreasonably interfered with the employee's work performance." *Passananti*, 689 F.3d at 667.[10]

The Due Process Clause—the second basis for the plaintiffs' § 1983 claims—extends substantive protection to a narrow subset of interests deemed fundamental. *Christensen v. County of Boone*, 483 F.3d 454, 462 (7th Cir. 2007) (per curiam). A "fundamental" interest is one that is "so deeply rooted" in our Nation's history and tradition "that no amount of process would justify its deprivation." *Id.* (citing *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997)). A person's right to bodily integrity is one such interest. *Park v. Ind. Univ. Sch. of Dentistry*, 692 F.3d 828, 832 (7th Cir. 2012).

### A. Equal Protection and Due Process Claims Brought by O'Callaghan

Schewe does not dispute that a reasonable jury could find that he seriously violated O'Callaghan's bodily integrity in violation of the Due Process Clause. Even so, O'Callaghan asserts that his actions toward O'Callaghan were not taken under color of state law, meaning that they cannot provide the basis for liability under § 1983.

The Court agrees that Schewe did not act under color of state law on November 2, 2017. In determining whether an action occurred under color of state law, the actor's intent is not dispositive. *See Walker v. Taylorville Corr. Ctr.*, 129 F.3d 410, 413-14 (7th Cir. 1997) (rejecting

---

[10] The standard for actionable sexual harassment under the Equal Protection Clause overlaps significantly with that for hostile-work-environment claims arising under Title VII. *See Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 835 (7th Cir. 2015). That said, the claims are distinct in several ways. Unlike Title VII, the Equal Protection Clause prohibits only intentional acts of discrimination. *Huff*, 493 F.3d at 902. And while Title VII applies to any employer, § 1983 is limited to state and private actions taken under color of state law. *Passananti*, 689 F.3d at 662 n.4. Finally, equal-protection claims are not limited to the employment context. *See Doe v. Bd. of Educ. of the City of Chi.*, 611 F. Supp. 3d 516, 533 (N.D. Ill. 2020) (recognizing a claim of sex discrimination under the Equal Protection Clause based on allegations of sexual harassment by a teacher against a student).

the argument that an official acted outside the color of state law simply because the official acted "in pursuit of her own interests"). "The important consideration," rather, "is the nature of the specific acts performed." *Latuszkin v. City of Chicago*, 250 F.3d 502, 505-06 (7th Cir. 2001). Actions fall within the scope of a state employee's official job duties when they bear the imprimatur of state law. *See Pleva v. Norquist*, 195 F.3d 905, 911 (7th Cir. 1999) (noting that neither party disputed that a mayor acted under color of state law in declining to reappoint a member of the Board of Zoning Appeals); *Esmail v. Macrane*, 53 F.3d 176, 177-80 (7th Cir. 1995) (finding that a plaintiff properly alleged § 1983 actions against a mayor and a city liquor commissioner who denied his request for a liquor license). Conversely, an official who exceeds the scope of her lawfully conferred authority likely acts outside the color of state law. *See Hughes v. Meyer*, 880 F.2d 967, 972 (7th Cir. 1989) (finding that the head of a state agency did not act under the color of state law when the official provided a tip to local sheriffs because the official's duties did not extend to general law enforcement). And actions that are unrelated to the performance of official duties typically do not carry the color of state law, either. *See Honaker*, 256 F.3d at 485 ("[A]cts by a state officer are not made under color of state law unless they are related in some way to the performance of the duties of the state office.").

Assuming that O'Callaghan's allegations of sexual harassment and assault are true (as the Court does whenever confronted with disputed material facts at the summary-judgment phase), Schewe did not take his actions under the color of state law. On November 2, Schewe engaged with students in a strictly informal setting—outside the classroom, after hours, and off campus.[11]

---

[11] The Court recognizes that Dr. Peter Ibarra decided to hold the discussion portion of his evening course on November 2, 2017, at the bar where others would be gathering, and some of his students joined Schewe's group once the session ended. *See* OAE Report 60, 63. But Schewe had no involvement in Dr. Ibarra's class.

The happy hour gathering that precipitated events at Schewe's apartment was not a department-organized or school-sanctioned event. *See* OAE Report 60 (summarizing a witness' testimony that official gatherings of the Criminology Department were held at a different bar). In fact, there is no indication that the UIC administration was even aware of the gathering. By all indications, it began as a private affair between Schewe and two colleagues, to which Schewe, at the last minute, decided to informally invite others, including men and non-students. *See id.* at 52.

Schewe's subsequent conduct only reinforces the conclusion that he did not act under color of state law. At no point in the night did Schewe concern himself with official responsibilities. His participation remained entirely "[un]related to any official duty or activity." *Honaker*, 256 F.3d at 485. Indeed, that is precisely what made Schewe's behavior so problematic. By fraternizing, drinking, smoking, and (according to the plaintiffs) engaging in sexual activity with students, Schewe was forsaking his official role as a professor, breaching all associated duties and responsibilities, and interacting with students in an overly personal and familiar manner. In no way did his conduct that night "relate[] in some way to the performance of the duties of the state office." *Id.*

The plaintiffs respond that, although Schewe may not have been executing his job description, he nonetheless abused his position by pressuring students to attend, drink, and tolerate his inappropriate behavior on November 2. The plaintiffs contend that Schewe's sexual harassment falls under color of state law because, while it did not advance official duties, it was facilitated by the significant power Schewe wielded over students. But for Schewe's status as a professor, the plaintiffs contend, they would not have tolerated Schewe's misbehavior or placed themselves in a vulnerable position by socializing with him while intoxicated.

The plaintiffs' premise is correct. "It is firmly established that a defendant in a § 1983 suit [also] acts under color of state law when he abuses the position given to him by the State." *Walker*, 129 F.3d at 413 (cleaned up) (quoting *West*, 487 U.S. at 49-50). In many cases, such abuse involves an official harmfully exercising the authority lawfully conferred upon them by virtue of their state position; in such contexts, courts have emphasized that the challenged conduct must "relate" to official duties to fall under color of law. *See Honaker*, 256 F.3d at 485. But the Seventh Circuit has been clear that whether conduct fits within the parameters of one's formal job description is not the *sine qua non* of the color-of-law analysis. A defendant who "overstep[s] the bounds of his state-granted authority" still—and perhaps even especially—acts under color of state law so long as the official was "cloaked with official power" at the time. *DiDonato v. Panatera*, 24 F.4th 1156, 1160 (7th Cir. 2022) (quotation marks omitted). What matters is not whether the misconduct occurred during the exercise of an official task, but whether it "involve[d] a misuse of power, possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Honaker*, 256 F.3d at 484 (quotation marks omitted). So if Schewe wielded his position of authority to coerce, pressure, or otherwise cause students to experience sex-based discrimination at his hands, his behavior would be actionable under § 1983.

The evidence, however, does not support the conclusion that Schewe invoked his authority to pressure or coerce student behavior on November 2. "The purpose of § 1983 is to deter state actors from using a badge of their authority to deprive individuals of their federally guaranteed rights." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). Given that purpose, it stands to reason that "[w]here . . . a plaintiff does not allege that a public official's actions involved some inappropriate invocation or exercise of state authority, there is no § 1983 claim." *DiDonato*, 24 F.4th at 1160. Schewe invoked no such badge. His happy hour invitation did not mandate attendance, condition

27

any benefit upon attendance, or threaten punishment for absences. Nor did Schewe describe the event as an official departmental gathering, link it to any pedagogical activity, or behave as, present as, or reference his authority as a professor. The plaintiffs' "complaint describes behavior that, while abhorrent, was 'wholly unconnected' to [Schewe's] employment." *DiDonato*, 24 F.4th at 1162 (quoting *First Midwest Bank v. City of Chicago*, 988 F.3d 978, 987 (7th Cir. 2021)). Schewe's actions that evening "were those of a private citizen in the course of a purely private social interaction," and they thus fall outside the color of state law. *Id.* (quotation marks omitted); *see also Hughes*, 880 F.2d at 971 ("[S]tate officials or employees who act without the cloth of state authority do not subject themselves to § 1983 suits.").

Resisting this conclusion, the plaintiffs contend that Schewe's status as their professor was independently sufficient to bring his conduct on November 2 under the color of state law. The plaintiffs insist that the stark power imbalance between Schewe and his students was an ever-present factor in their interactions, and that, knowing this, Schewe did not have to explicitly invoke his authority to benefit from the deference it automatically garnered. As such, the plaintiffs contend that Schewe's mere position was enough to bring his alleged assault of O'Callaghan under the color of law, regardless of what Schewe may or may not have done to invoke that position.

The Court does not deny that a certain feeling of discomfort and pressure will necessarily accompany even informal requests or invitations extended by a superior despite there being no "strings" attached. Critically, however, such a feeling of discomfort is not sufficient in and of itself to attribute the color of law to such invitations or requests. Simply possessing authority is insufficient to bring all actions toward those over whom such authority extends under the color of law. To be liable under § 1983, a state actor must proactively invoke, wield, or otherwise apply their authority in a way that facilitates unlawful conduct. *See DiDonato*, 24 F.4th at 1161 ("To

28

plead that a defendant acted under color of state law, a § 1983 plaintiff must allege that a defendant's invocation of state authority in one way or another facilitated or enabled the alleged misconduct."); *Walker*, 129 F.3d at 413-14 (finding that a state employee committed misconduct under the color of state law because "she was able to do so *solely because* of the position of authority she enjoyed" (emphasis added)). As the Supreme Court explained in *West v. Atkins*, to "act[] under color of state law requires that the defendant in a § 1983 action have *exercised* power possessed by virtue of state law." 487 U.S.. at 49 (emphasis added) (quotation marks omitted).

Despite any passive coercive power Schewe might have necessarily radiated due solely to his position, the defendant did not take an affirmative action to invoke or apply his authority on November 2. By necessary implication, it follows that Schewe's alleged misconduct did not depend on (and was not facilitated by) an exercise of official authority. As such, the Court concludes that Schewe's alleged sexual harassment and assault of O'Callaghan was not under color of state law. *Cf. Doe v. Smith*, 470 F.3d 331, 341 (7th Cir. 2006) (finding, in stark contrast to Schewe's case, that a principal plausibly acted under color of law where the principal abused a child after ordering him into his office and after receiving him into his court-ordered custody); *Wudtke v. Davel*, 128 F.3d 1057, 1064 (7th Cir. 1997) (finding that a defendant acted under color of law when he "abused his position as superintendent of the school district (and [the plaintiff's] ultimate employer) by explicit invocation of his state-granted powers" by "threaten[ing] to take adverse employment actions against her" if she did not agree to engage in sexual activities with him).[12]

---

[12] Because the foregoing analysis does not turn on whether Schewe's conduct qualifies as prohibited sex discrimination under the Fourteenth Amendment, the Court need not attempt to reconcile prior Circuit case law that seemingly takes different views about the intent required to establish sex discrimination. The Seventh Circuit has held that, to establish a violation of the Equal Protection Clause based on sexual harassment, a female plaintiff must demonstrate that the

**B. Equal-Protection Claims Brought by Shepp, Lorenz, Kirkner, Malone, and Fry**

Schewe stops short of claiming that he acted beyond the color of law in all of his interactions with the remaining plaintiffs.[13] That said, Schewe maintains that the evidentiary record does not establish sufficiently severe or pervasive sexual harassment of Shepp, Lorenz, Kirkner, Malone, or Fry to give rise to an equal-protection claim. The Court agrees.

As a threshold matter, much of Schewe's alleged misconduct toward those five plaintiffs does not qualify as sexual harassment. Courts have understood "sexual harassment" to mean "the form of sex discrimination . . . that consists of efforts . . . to make the workplace [or, in this case, school environment] intolerable or at least severely and discriminatorily uncongenial to women" as well as "efforts (normally by supervisors) to extract sexual favors by threats or promises." *DeClue v. Cent. Ill. Light Co.*, 223 F.3d 434, 437 (7th Cir. 2000) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 752 (1998)).

There is no evidence that Schewe sought to "extract sexual favors by threats or promises" or created a "severely and discriminatorily uncongenial" environment for women by inviting the plaintiffs to his boat. *Id.* The record indicates that Schewe invited both male and female students

---

defendant intentionally discriminated against her "because of her status as a woman as opposed to characteristics, albeit some no doubt sexual, which were personal to her." *Trautvetter v. Quick*, 916 F.2d 1140, 1152 (7th Cir. 1990); *see also Bohen v. City of East Chicago*, 799 F.2d 1180, 1186-87 (7th Cir. 1986); *Chaparro v. City of Chicago*, 47 F. Supp. 3d 767, 775 (N.D. Ill. 2014) ("[S]exually-oriented vulgarity does not constitute sexual harassment unless it is directed at the recipient on account of the recipient's gender."). In *King v. Board of Regents of the University of Wisconsin System*, however, our Court of Appeals also held that "treatment of [an] individual based on sexual desire is sexually motivated," and can therefore constitute harassment. 898 F.2d 533, 539 (7th Cir. 1990).

[13] The Court's finding that Schewe acted beyond the color of state law on November 2 is not dispositive of whether Schewe acted under color of law during his interactions with O'Callaghan's co-plaintiffs on other occasions, but query whether those plaintiffs can buttress their § 1983 equal-protection claims with what the Court has found to be a private party's private conduct in a private setting.

and neither threatened nor requested sexual favors from the plaintiffs during his boat parties. *See* OAE Report 51. Likewise, a reasonable jury could not conclude that Schewe's inappropriate comments were designed to elicit sexual favors or created a hostile environment. Many of the most offensive—such as Schewe's statements that he "only fuck[s] students after they've defended" and "there are so many women here I want to fuck"—were directed not to the plaintiffs but to third parties. *See* Malone Statement 2; Lorenz Findings Letter 3. And the Seventh Circuit has emphasized that "the impact of [such] 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff." *Gleason v. Mesirow Fin., Inc.*, 118 F.3d 1134, 1144 (7th Cir. 1997).

And some of the misconduct that plaintiffs personally experienced was not directed at all, but accidental. The evidence reveals that Schewe texted Lorenz inappropriate images by mistake, later apologizing. Lorenz Statement 2. Every indication suggests that the incident in Schewe's office was similar: While pictures of naked women were open on Schewe's computer, there is no evidence that Schewe intended for Lorenz to see them or otherwise sought to create a hostile environment.

For the reasons described above, the Court finds that Schewe's alleged behavior toward Shepp, Lorenz, Fry, Kirkner, and Malone does not constitute sexual harassment. Even if it did, however, Schewe's conduct toward those five was insufficiently pervasive to support a claim of sex-based discrimination. "Offhand comments" and "simple teasing do not rise to the level of" an equal-protection violation. *See Passananti*, 689 F.3d at 667. Nor do "relatively isolated instances of non-severe misconduct." *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir. 1993) (quotation marks omitted). All told, the plaintiffs allege approximately ten instances of misconduct over the course of a year, more than half of which were one-off events that did not reoccur.

Episodic conduct of the sort at issue here falls well short of "pervasive." *Cf. Jackson v. County of Racine*, 474 F.3d 493, 499 (7th Cir. 2007) (daily acts of harassment deemed to be pervasive).

Of course, a plaintiff need not show a sustained pattern of sexual harassment to make out an equal-protection claim. "[E]ven one act of harassment will suffice if it is egregious." *Hostetler v. Quality Dining, Inc.*, 218 F.3d 798, 808 (7th Cir. 2000). With the exception of Schewe's alleged conduct toward O'Callaghan, however, the misconduct the plaintiffs highlight does not amount to unconstitutional sex-based discrimination. "[T]he occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish [men]" does not an equal-protection claim make. *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir. 1995). Yet Schewe's conduct toward Shepp, Malone, Fry, Kirkner, and Lorenz consists of little more.

Shepp, Malone, Fry, Kirkner, and Lorenz respond that Schewe's alleged sexual assault is relevant to their equal-protection claims because, although they were not targeted by that conduct, they nonetheless fell within the "target area" of the abuse that O'Callaghan suffered as a woman. The plaintiffs claim that O'Callaghan's experience contributed to an overall hostile environment for women on campus and that O'Callaghan's reports of the incident exacerbated both their own perceptions of harassment and the objective reasonableness of those perceptions.

As a threshold matter, the plaintiffs provide no authority for the notion that the Equal Protection Clause extends to those within the "target area" of harassment. Every case cited by the plaintiffs was decided in the Title VII context, where the Seventh Circuit has indeed recognized that "a worker may be subject to sexual harassment either as the individual target of hostile or abusive conduct of a sexual nature, or because she is in the 'target area' of such conduct." *EEOC v. Int'l Profit Assocs.*, 654 F. Supp. 2d 767, 784 (N.D. Ill. 2009) (quoting *Yuknis v. First Student, Inc.*, 481 F.3d 552, 554 (7th Cir. 2007)). The Seventh Circuit has noted, however, that while § 1983

can provide "a parallel remedy to a Title VII harassment claim," *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 835 (7th Cir. 2015), the two statutes are not "identical," *Passananti*, 689 F.3d at 662 n.4. Section 1983 may be invoked only by "the party injured" by a "deprivation of any [constitutional or legal] rights." 42 U.S.C. § 1983. And the Equal Protection Clause, unlike Title VII, is limited to intentional acts of discrimination. *Huff*, 493 F.3d at 902. It is far from clear that the *intended* victims of Schewe's sexual harassment and assault of O'Callaghan included all of O'Callaghan's female classmates. The plaintiffs provide no case law supporting such a principle, and the Court has not independently identified any.

Even if § 1983 did not provide a doctrinal barrier to considering Schewe's actions on November 2, the plaintiffs' hostile-environment claim would still fail. With respect to Title VII—which has no intentional discrimination or color-of-law requirement—our Court of Appeals has been clear that plaintiffs may not simply "hitch" their sexual harassment claims to that of a third-party victim. Mere membership in a target area of discrimination is not enough. To prevail, a plaintiff must do more than show actionable sexual harassment against a third party on the basis of a protected characteristic that the plaintiff shares. The plaintiff must also show that she "personally experienced . . . an objectively hostile work environment" as a result of the second-hand harassment. *See Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 567 (7th Cir. 2004) (denying a hostile-environment claim upon finding that the plaintiff had not "personally experienced . . . an objectively hostile work environment" because of harassment experienced by a third party). In other words, "the plaintiff must show that the work environment was so pervaded by discrimination that the terms and conditions of employment were altered"—just as the plaintiff must when alleging direct discrimination. *Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013).

When weighing whether second-hand harassment is sufficiently severe to create (or dispositively contribute to) a hostile environment, courts do not consider the severity of the harassment *vis a vis* the direct victim. *EEOC v. Vill. at Hamilton Pointe LLC*, 102 F.4th 387, 403 (7th Cir. 2024). Instead, the relevant consideration is "the impact of the third-party harassment on the [plaintiff] employee's working environment." *Id.* That impact is necessarily diminished, given that "the impact of [] second-hand harassment is obviously not as great as the impact of harassment directed at the [target]." *Smith*, 388 F.3d at 567 (cleaned up); *see also Ellis v. CCA of Tenn. LLC*, 650 F.3d 640, 647 n.2 (7th Cir. 2011) ("In the context of a hostile work environment claim, secondhand harassment is less severe than firsthand harassment.").

Other factors can further diminish the impact of second-hand sexual harassment on a plaintiff's environment. For instance, even an action that is "highly offensive and wholly unacceptable" might fall short of creating a hostile environment if it is a "single incident [that] took place outside of the workplace." *Scurlock v. IRC, LP*, 716 Fed. App'x 544, 546 (7th Cir. 2017). Indeed, in *DaSilva v. Indiana House of Representatives*, the court rejected a hostile-environment claim where the defendant's problematic behavior occurred at "an event that was an informal gathering, outside of the workplace, and after working hours" and where "[t]he acts did not occur over a period of time." 641 F. Supp. 3d 513, 537 (S.D. Ind. 2022). Those considerations apply with full force here. Although Schewe's alleged harassment and assault of O'Callaghan is repugnant and unacceptable, the fact that it did not target the other plaintiffs, occur within the educational context, involve Schewe presenting or invoking his position as a professor, or recur cuts against a finding of a hostile educational environment. All things considered, the Court does not find that Schewe's misconduct toward O'Callaghan, coupled with the incidents involving her

co-plaintiffs, effectively "altered the conditions" of the plaintiffs' education "such that it created an abusive [academic] environment." *Passananti*, 689 F.3d at 667.

In sum, the Court finds that, although Schewe's behavior toward Shepp, Malone, Kirkner, Fry, and Lorenz "was undoubtedly inappropriate, it was not so severe or pervasive as to create an objectively hostile [] environment." *Saxton*, 10 F.3d at 534. Schewe's actions on November 2 do not alter that conclusion—first, because no case law supports bringing a "target area" claim under § 1983; second, because conduct by a non-state actor beyond the color of state law cannot support a § 1983 claim; and third, because plaintiffs did not suffer from a hostile educational environment as a result. Accordingly, Shepp, Malone, Fry, Kirkner, and Lorenz have failed to support a claim of sex-based discrimination under the Equal Protection Clause.

### C. Due-Process Claims Brought by Shepp, Lorenz, Kirkner, Malone, and Fry

Shepp, Malone, Fry, Kirkner, and Lorenz have also failed to marshal sufficient evidence to support a due-process claim. Violating the Due Process Clause's fundamental right to bodily integrity requires a "serious physical assault." *Wudtke*, 128 F.3d at 1063. Less severe forms of battery, including "offensive touching," do not suffice. *Alexander v. DeAngelo*, 329 F.3d 912, 916 (7th Cir. 2003). Yet Malone, Shepp, Fry, Lorenz, and Kirkner do not allege any act of battery taken against them, much less a serious assault.

The only act of offensive physical touching contained in the five plaintiffs' reports comes from Fry, who recalled some of Schewe's friends slipping their fingers into a hole in her jeans while onboard his boat. *See* Fry Statement 2. But the Due Process Clause does not impose an affirmative obligation on state actors to shield plaintiffs from violations by private, non-party actors. *See DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). Schewe, even if deemed a state actor here, *but see supra* Section II.A, is not alleged to have committed any

such act against Malone, Shepp, Fry, Lorenz, or Kirkner. Their due-process claims thus fail as a matter of law.

$$*\quad *\quad *$$

The Court concludes that the evidentiary record would compel any reasonable jury to find that: (1) no UIC official with the capacity to take corrective action knew that Schewe had engaged in misconduct rising to the level of sex-based discrimination; (2) Dr. Richie, the only person who even arguably possessed such knowledge, was not deliberately indifferent to the plaintiffs' allegations; (3) OAE afforded the plaintiffs the same procedural privileges and substantive consideration as any male counterpart; and (4) neither OAE nor the broader UIC administration evinced bias on account of the plaintiffs' sex. Accordingly, the Court grants summary judgment to Defendant UIC on all counts against it, dismissing UIC as a defendant to this action.

The Court also concludes that the evidence forecloses any conclusion that: (5) Schewe engaged in severe or pervasive sexual harassment against Shepp, Malone, Lorenz, Kirkner, or Fry; (6) Schewe violated the bodily integrity of Shepp, Malone, Lorenz, Kirkner, or Fry; or (7) Schewe engaged in unconstitutional sex-based discrimination against O'Callaghan while acting under the color of state law. For this reason, the Court grants Defendant Schewe's motion for partial summary judgment, entering summary judgment in his favor on the plaintiffs' federal constitutional claims arising under the Fourteenth Amendment.

In light of the dismissal of UIC as a defendant, UIC's pending motion to exclude proposed expert witness Nancy Chi Cantalupo, ECF No. 154, is denied as moot.

Dated: February 14, 2025

John J. Tharp, Jr.
United States District Judge

36